In the Matter of the Application of JOHN C. BOWE and Others, Petitioners, for a Peremptory Mandamus Order against S. HOWARD COHEN and Others, Members of the Board of Elections and Clerk of the City of New York, Respondents.*

Supreme Court, Special Term, New York County, March 15, 1937.

*Cullen & Dykman* [*Abraham S. Gilbert, Jackson A. Dykman, William J. O'Shea, Jr.,* and *Edward D. Burns* of counsel], for the petitioners.

*Paul Windels, Corporation Counsel* [*William C. Chanler, Frederick V. P. Bryan* and *Seymour B. Quel* of counsel], for the respondents.

* Affd., 274 N. Y. 411.

*John T. Dooling,* for the Chairman of the New York County Democratic Committee, intervenor.

*Gabriel L. Kaplan,* for the Chairman of the New York County Republican Committee, intervenor.

*Francis D. McGarey,* for the Chairman of the Kings County Democratic Committee, intervenor.

*A. David Benjamin,* for the Chairman of the Kings County Republican Committee, intervenor.

*Walter A. Lynch,* for the Chairman of the Bronx County Democratic Committee, intervenor.

*Sydney Rosenthal,* for the Chairman of the Queens County Democratic Committee, intervenor.

*William A. Smith,* for the Chairman of the Richmond County Democratic Committee, intervenor.

CHURCH, J. This is a proceeding brought by citizens and taxpayers for a peremptory order of mandamus to compel the respondents to conduct the election for councilmen in each of the boroughs of the city of New York at the general election in 1937 pursuant to the provisions of subdivision b of section 22 of the New Charter of the City of New York (New York City Charter, adopted Nov. 3, 1936, in effect Jan. 1, 1938) and not pursuant to chapter 43 of the New Charter, on the ground that chapter 43, which provides for the election of councilmen by a system of proportional representation, is unconstitutional. The primary question in the case is whether or not the system of proportional representation as provided for by chapter 43 of the New Charter, and as adopted by a majority of the voters who voted on the question when it was submitted to the people at the election in November, 1936, is constitutional.

Under chapter 43 each borough is made a single, separate district for the election of councilmen and is entitled to elect one council-man for every 75,000 voters who cast valid votes therein. A remainder of 50,000 voters, or more, entitles the borough to one additional councilman. (§ 1003.) Primaries are abolished and nominations for candidates for councilmen are made by nominating petitions in which party names may be designated. (§ 1004.)

The names of the candidates are to be placed upon paper ballots unless voting machines are provided. The names are to appear in alphabetical order, with a rotation by election districts, and may contain party designations. (§ 1005.) The instructions to voters are to appear on the ballot and are as follows (§ 1005, subd. 4):

" Instructions
" Mark Your Choices With Numbers
Only. (Do Not Use X Marks.)

" Put the number 1 in the square opposite the name of your first choice.

" Put the number 2 opposite your second choice, the number 3 opposite your third choice, and so on. You may mark as many choices as you please.

" Do not put the same number opposite more than one name.

" To vote for a person whose name is not printed on this ballot, write his name on a blank line under the names of the candidates and put a number in the square opposite to show which choice you wish to give to him."

After the voting has taken place, the ballots are removed to a central counting place for each borough, where they are arranged in the order of election districts, starting with the first election district of the first Assembly district, the first election district of the second Assembly district, the first election district of the third Assembly district, etc. (§ 1006.) When the counting of the ballots is commenced, the first election district to be counted is determined by lot and is then followed by the corresponding election district in the next Assembly district, and the other election districts in regular order according to the sorting previously made. (§ 1007-a.)

At the beginning of the count the ballots are sorted according to the first choices marked on them. (§ 1007-a.) If any candidate receives 75,000 first choice ballots, he is declared elected and subsequent ballots showing him as first choice are each credited to the second choice marked thereon, or, if the second choice also has been elected, to the next choice marked thereon for a candidate not yet elected. (§ 1007-e.)

After all of the ballots have thus been sorted and counted in favor of the highest available choice indicated upon them, the total number of valid ballots cast is determined, and that figure is divided by 75,000. The result of this division determines the total number of councilmen to be elected from the borough in question, except that, if there is a remainder of 50,000 or more, the borough is entitled to one additional councilman. Of course each borough is entitled to at least one councilman in any event. (§ 1007-g.)

After all of the ballots have thus been counted once, any candidate who has less than 2,000 votes is declared defeated and his ballots are transferred each to the candidate indicated thereon as the next choice among the continuing candidates (a continuing candidate meaning a candidate not yet elected or defeated). (§§ 1007-h, 1007-i.) When all the ballots of the candidates with fewer than 2,000 ballots have been transferred, the candidate who is then lowest on the poll is declared defeated and his ballots are transferred in the same way. (§ 1007-j.) This process is repeated with the candidate

who is then lowest. The lowest candidates are declared defeated one at a time and their ballots transferred to next available choices until the number of candidates to be elected from the particular borough have received the quota of 75,000 votes or until only that number are left, in which case all are declared elected whether they have reached the quota or not. (§§ 1007-m, 1007-n.)

It is thus apparent that every vote is in the first instance counted in favor of the candidate whom the voter most prefers and who has not already been elected by the votes of others. Thereafter, if the candidate thus most preferred by the voter is declared defeated as having no possible chance of election, the voter has the additional privilege that his vote will be continuously counted for his most available choice.

The principal attack on constitutional grounds made upon proportional representation by the petitioners is based upon the provisions of article 1, section 1, and article 2, section 1, of the State Constitution. These provisions, so far as pertinent, provide as follows:

Art. 1, § 1: " No member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land."

Art. 2, § 1: " Every citizen of the age of twenty-one years, who shall have been a citizen for ninety days, and an inhabitant of this State one year next preceding an election, and for the last four months a resident of the county and for the last thirty days a resident of the election district in which he or she may offer his or her vote, shall be entitled to vote at such election in the election district of which he or she shall at the time be a resident, and not elsewhere, for all officers that are now or hereafter may be elective by the people, and upon all questions which may be submitted to the vote of the people."

The theory of the petitioners is that under the system of proportional representation voters are " disfranchised " because, according to their claim, their votes are not " counted " for a candidate for each member of the council to be elected from the borough in which their vote is cast.

Section 1 of article 2 was apparently put in the State Constitution of 1821 in order to do away with the property distinctions in the State Constitution of 1777, under which the right to vote for State Senators was restricted to those having freeholds to the value of £100 and the right to vote for members of the lower house was restricted to lower property qualifications. In other words, the intention of its adoption was the prescribing of qualifications of voters rather than the regulation of the method of election.

Section 1 of article 2 of the State Constitution does not prescribe any particular method of election. It merely provides that all citizens " shall be entitled to vote  *  *  *  for all officers that now are or hereafter may be elective by the people."

The argument that this provision is violated by the system of proportional representation is based upon an apparently strained interpretation of its intent and meaning.

It is predicated upon the proposition that the particular system of voting at present existing in the State by single member districts is the only permissible one under the political system of the State by section 1 of article 2, except by amendment to the Constitution. Yet there is nothing expressly in the section which prescribes any particular method of voting or of counting votes. On the contrary, so long as all citizens are given an equal right and power to vote in all elections at which any public officers are to be elected, it would seem that the provisions of the section were amply complied with. The precise manner of voting or counting votes is immaterial. As was held by the Court of Appeals in the case of *Spitzer* v. *Village of Fulton* (172 N. Y. 285, at p. 289): " The obvious purpose of that article was to prescribe the general qualifications that voters throughout the State were required to possess to authorize them to vote for public officers." (See, also, Dougherty, Constitutional History of New York State, pp. 93–96; Lincoln, Constitutional History of New York, vol. 1, pp. 640–652.)

Petitioners' argument is necessarily predicated upon the proposition that the word " vote " has a particular meaning, to wit, to vote in the precise manner at present in effect in this State. We have found nothing either in the Constitution or in the statutes to support such a proposition. There being no statutory definition of the word, we must turn to the dictionary. According to Webster's Dictionary, the words " to vote " mean " To express or signify the mind, will, or preference, either *viva voce* or by ballot, etc., as a means of deciding on any proposition in which one has an interest with others; to cast or give a vote." (See, also, Century Dict.)

Under the system of proportional representation, every voter in each borough of the city may express the order of his preference for every candidate for councilman from his borough. He would seem to have a much greater power of voting under that system than under the present system of single member districts. For under the present system he may vote for only one member of the board of aldermen, and, if he is in the party at the time in minority, his vote is ineffective. Statistics indicate that on an average sixty-five per cent of the electors of the city of New York who cast a vote for members of the board of aldermen under the present system

elect ninety-seven per cent of that board, and the balance elect only three per cent. In other words, nearly thirty-five per cent of the voters in the city of New York are unrepresented on the board of aldermen by any members of their selection and their votes are ineffective.

Apparently, petitioners' argument is that under the proportional representation system, although a voter may declare the order of his preference for all candidates, his ballot may be counted for only one. The answer is, *first*, that under the present system his ballot is counted for only one member of the board of aldermen, and, *second*, that whereas at the present time the chances are that his ballot may be ineffective, under the proportional representation system his vote will almost certainly be effective actually to elect the candidate most preferred by the voter, and who has not been already elected by the votes of others.

Instead of disfranchising any citizen or decreasing the power of his vote in an election for members of the city council, this system insures to practically every voter that his vote will actually be used in helping to elect some member of the board. If it is not used actually to elect the member for whom he has expressed his first choice, it is because that candidate is already elected or has no chance of election. To count his vote for such a candidate would mean merely to make it ineffective; instead, his second, third, fourth or further choice receives the benefit of his vote, depending upon which one needs it and might benefit by it.

There is considerable doubt whether, even before the adoption of the Home Rule Amendment (Art. 12), article 2, section 1, was applicable to local elections. In any event, it seems that conditions may be prescribed with respect to voting on local questions or candidates which would not be permissible under that section so far as State issues or candidates are concerned.

In *Spitzer* v. *Village of Fulton* ([1902] 172 N. Y. 285) the Court of Appeals had before it the question of the constitutionality of a statute (Laws of 1898, chap. 269, art. 2, § 5), which provided that only persons who were the owners of property in a village could vote upon propositions submitted at the village election. In rejecting the contention that this provision was violative of article 2, section 1, of the State Constitution, the Court of Appeals said in a *per curiam* opinion (172 N. Y. 285, at p. 289): " The contention of the plaintiffs is that the provisions of chapter 269 contain a restriction upon the provisions of article two as to the right to vote for elective officers and upon all questions which may be submitted to the vote of the people, and, hence, are violative of its provisions. The obvious purpose of that article was to prescribe the general qualifications

that voters throughout the State were required to possess to authorize them to vote for public officers or upon public questions relating to general governmental affairs. But we are of the opinion that that article was not intended to define the qualifications of voters upon questions relating to the financial interests or private affairs of the various cities or incorporated villages of the State, especially when, as in this case, it relates to borrowing money or contracting debts."

This principle was reaffirmed in *Matter of Carrick* ([4th Dept. 1918] 183 App. Div. 916; affd. on a procedural point [1918], 223 N. Y. 621).

Counsel for petitioners argue in their memorandum that these cases are not applicable because they apply only to elections upon a proposition submitted to the people, rather than to the election of officers. This appears to be a distinction without a difference. Section 1 of article 2 provides that " every citizen  *  *  *  shall be entitled to vote  *  *  * for all officers that now are or hereafter may be elective by the people, and upon all questions which may be submitted to the vote of the people." If the latter portion of this provision is inapplicable to local elections, the former would seem likewise to be inapplicable.

Section 3 of article 12 of the State Constitution, commonly known as the Home Rule Amendment, confers authority upon every city to adopt " local laws not inconsistent with the Constitution and laws of the State, relating to the powers, duties, qualifications, number, mode of selection and removal, terms of office and compensation of all officers and employees of the city." That the chapter here under attack was adopted in accordance with the provisions of the Home Rule Amendment was decided by the Court of Appeals in *Matter of Mooney* v. *Cohen* (272 N. Y. 33; remittitur amended, Id. 597).

The " mode of selection " of city councilmen provided for by chapter 43 of the New Charter does not seem to be " inconsistent " with either section 1 of article 1 or section 1 of art.cle 2 of the State Constitution. No one is " disfranchised " in violation of article 1; and section 1 of article 2 does not specify any particular " mode of selection."

But, if we were to accept petitioners' argument that section 1 of article 2 in effect prescribes a particular means of electing public officers in the State, and if it is applicable to local elections at all, then it would seem to follow that that section has been modified by the subsequent enactment of section 3 of article 12. The Constitution cannot reasonably be construed to be inconsistent with itself. If article 2, section 1, prescribes a detailed and exclusive mode of

electing public officers, and section 3 of article 12, a later enactment, specifically grants to cities the power to adopt local laws relating to the same subject-matter, it should follow that the later enactment *pro tanto* modifies the earlier.

The apparent intent of the provision in section 3 of article 12, that local laws shall be " not inconsistent with the Constitution and laws of the State," is to prevent a local law from violating any provision of the Constitution or laws of the State which is not itself modified by the grant of power contained in the Home Rule Amendment. In other words, although under the Home Rule Amendment a city must have the power to provide for a different mode of election of its public officers than that provided for in article 2, yet at the same time it could not do so in such a manner as to violate some other and different provision of the Constitution, such, for instance, as the provision prohibiting any discrimination between citizens on account of race or religion. To that extent, local laws must not be inconsistent with the Constitution. But to hold that the " mode of selection " must conform to any " mode of selection " elsewhere prescribed in the Constitution would destroy utterly the Home Rule Amendment itself.

This proposition seems to have been laid down by the Court of Appeals.

In the case of *Bareham* v. *City of Rochester* (246 N. Y. 140), although the constitutionality of proportional representation was not passed upon therein, the Court of Appeals had before it a local law adopted by the city of Rochester, in effect a so-called city manager charter. The specific provision of the Constitution upon which the attack in that case was based was section 2, article 10, which commands that " all city * * * officers, whose election or appointment is not provided for by this Constitution shall be elected by the electors of such cities, * * * or appointed by such authorities thereof, as the Legislature shall designate for that purpose." The court held that, if there were any inconsistency between that provision of the Constitution and the city charter adopted pursuant to the Home Rule Amendment, the latter prevailed. The court said (246 N. Y. 145): " If article 12, section 3, could be said to be inconsistent with article 10, section 2, it would have the effect, as a later enactment, to modify the earlier one. Those parts of the local law assailed as inconsistent with article 10, section 2, derive their authenticity from chapter 363, Laws of 1924, section 11 [City Home Rule Law], which, in turn, is valid in its relation to article 12, section 3. This section, as part of the Constitution, cannot be inconsistent with itself. The local law springs from the Home Rule statute and that statute descends from the

Constitution. A different interpretation of the combined effect of article 10, section 2, and article 12, section 3, would tend toward an unreasonable result and would defeat the purpose of the Home Rule Amendment."

Furthermore, this case provides an answer to any argument to the effect that the words " mode of selection," as contained in the Home Rule Amendment, are in any way limited in their meaning.

The local law provided that the council of nine members, nominated and elected in a manner very different from that provided for under the Election Law, although not by proportional representation, should " select " [sic] the mayor and city manager, the latter being vested with the principal powers formerly exercised by the mayor, who had been an elective officer. Obviously, this is a far more drastic variation of the " mode of selection " of city officers provided for either by section 2 of article 10 or by section 1 of article 2 than that presented by proportional representation.

If it is no violation of the Constitution to vest the powers previously enjoyed by a mayor elected by all the voters in a city manager and mayor " selected " by a council of nine members, it can hardly be successfully urged that a provision whereby all the voters may elect members of the council by a system of proportional representation is unconstitutional.

Yet the court held that this change was authorized by the Home Rule Amendment. The court held (246 N. Y. 146): " The term ' mode of selection ' expresses an intent to allow a city to determine not only that it shall cause its officers either to be elected or appointed but connotes also that a municipality may define the precise method by which either an election or appointment shall be effected. To hold that the expression restricts municipal action merely to a choice of election or appointment would, we think, place a narrower interpretation on that phrase than the Constitution and the statute intended. We find no contrary doctrine declared in *Sturgis* v. *Spofford* (45 N. Y. 446) nor in *People* v. *Dooley* (171 id. 74), cases cited by appellant. The better view is that cities are empowered by the new constitutional provision not only to make this choice but are authorized to direct the manner by which their officers shall be enabled to assume their positions."

And again (246 N. Y. 149) the court said: " The municipality is empowered to modify an election law in so far as that law affects the property, government or affairs of the municipality, *i. e.*, in so far as it affects the election of the local officers."

The Court of Appeals has apparently said that the Home Rule Amendment grants to cities the broadest possible powers to enact laws relating to the method and mode of election or selection of

their public officers. If, as urged by the petitioners, section 1 of article 2 of the Constitution provides for any particular mode of election or selection of public officers in accordance with any particular kind of election, then it must be inconsistent with the powers granted to cities in this regard by the Home Rule Amendment, and, in so far as there may be any inconsistency between a mode of selection adopted by a city under the Home Rule Amendment and section 1 of article 2, the mode of selection adopted by a city, deriving its authority directly from the Home Rule Amendment itself, must prevail. The Home Rule Amendment must be deemed " as a later enactment, to modify the earlier one " *pro tanto*.

The constitutionality of proportional representation as such has never been passed upon by our Court of Appeals (except perhaps in *Matter of Mooney* v. *Cohen*, 272 N. Y. 33; remittitur amended, Id. 597, which we will hereinafter discuss), but counsel for the petitioners suggest that we may rely upon a practical construction of the Constitution to determine the question here at issue.

Counsel place great reliance upon an opinion of the learned counsel to a former charter commission, and upon an alleged assumption of " judges, lawyers and party managers " that proportiona. representation was unconstitutional. (Memorandum, pp. 15–19.) We are not aware that either opinions of counsel to a charter commission, or alleged unexpressed opinions of judges, lawyers or other persons, while not acting in an official or public capacity, can be relied upon in support of any " practical construction." We might point out in passing, however, that the counsel for the former charter commission (for whom personally and for whose opinions the court has the highest respect) conceded that the question was an open one, and we might point out further that the present charter commission was not only represented by very able counsel, but that it contained in its membership two former Solicitors General of the United States and a former justice of the Appellate Division of the Supreme Court for this department, as well as other eminent members of the bar.

As we understand the doctrine of " practical construction," however, only the public acts of administrative officials and Legislatures can be relied upon in applying it. As pointed out by counsel for the petitioners, there were in existence for a period of thirty years statutes of the Legislatures of the State of New York providing that the legislative body of this city be elected by a system of " limited voting." This system is another and quite arbitrary method of insuring minority representation. It was an early recognition in the political history of the State of the principle: " In a democratic government, the right of decision belongs to the majority,

but the right of representation belongs to all." (Salem Dutcher in Minority of Proportional Representation, N. Y., 1872, quoting Ernest Naville, La Patrie et les Partis, Geneva, 1865.) It is greatly different from proportional representation and is open to many serious objections which do not apply to the latter. The principal difference between the two systems is that under limited voting the voter may not exercise his franchise by expressing his choice or preference in any manner whatsoever for candidates for more than a limited number of the offices to be filled by election from his district. If section 1 of article 2 of the Constitution applies to local elections and has the specific meaning which petitioners attempt to place upon it (that every voter must have a right to cast a vote which will be actually counted for a candidate for every elective office), the limited voting system would seem clearly to violate that provision. As pointed out by counsel for the petitioners, this system was continually under attack as being unconstitutional. Yet, although the question reached the Court of Appeals not less than four times, it was never once declared unconstitutional, though it was never explicitly upheld, the court finding in each case other grounds of decision. (*Demarest* v. *Wickham*, [1875] 63 N. Y. 320; *People ex rel. Watkins* v. *Perley*, [1880] 80 id. 624; *People ex rel. Woods* v. *Crissey*, [1883] 91 id. 616; *People ex rel. Angerstein* v. *Kenney*, [1884] 96 id. 294, 301, in which Judge EARL, writing for the court, said: " The constitutional question which the plaintiffs sought to raise by the commencement of this action is a very grave and interesting one, and should not be decided in any case unless it is properly presented, and necessarily involved.")

Furthermore, during this entire period, the statutes providing for limited voting were amended not less than seven times. (Laws of 1842, chap. 130, tit. 3, art. 3, § 21; Laws of 1857, chap. 590; Laws of 1858, chap. 321; Laws of 1873, chap. 335; Laws of 1873, chap. 757; Laws of 1874, chap. 515; Laws of 1878, chap. 400, § 1; Laws of 1882, chap. 410, § 29; Laws of 1887, chap. 292.)

Thus we have a history of thirty years of administrative construction by the election officials and legislative construction by the Legislature, re-enacted in somewhat different form by Legislature after Legislature, without interference by the courts, although continuously under consideration by them. This practical construction cannot entirely be disregarded.

Moreover, there are rational grounds for concluding that the Court of Appeals may have intended to sustain the constitutionality of proportional representation in *Matter of Mooney* v. *Cohen* (272 N. Y. 33; remittitur amended, Id. 597).

The *Mooney* case was a mandamus proceeding commenced by the petitioner for the purpose of restraining the board of elections from submitting to the voters at the election held in November, 1936, two propositions: (1) The question of the adoption of a proposed new city charter; and (2) the separate question whether the members of the council under the proposed new city charter should be elected by proportional representation. An order of mandamus was issued in the petitioner's favor at Special Term, Kings county, but was reversed by the Court of Appeals.

It is urged by petitioners that this case passed only on the narrow question as to whether or not the proposition relating to proportional representation was properly submitted to the people and that the court refrained from passing upon the constitutionality of the proposition itself. In support of this proposition petitioners cite the opinion of Mr. Justice RIEGELMANN in passing upon the question of whether the Nassau county charter should be submitted to the voters. (*Matter of Burke* v. *Krug*, 161 Misc. 687.) It is no doubt true, as Mr. Justice RIEGELMANN stated, that the court will not pass upon the constitutionality of every provision contained in a proposed new charter dealing with numerous unrelated subjects in advance of its adoption by the people. Obviously, the invalidity of a specific provision will not invalidate the whole. If the document in its entirety is valid, an objection to a particular provision can and should be dealt with as it arises.

But the situation as to the separate question of the constitutionality of chapter 43 may be entirely different. There but a single question was involved: Does the system of proportional representation violate the Constitution of the State of New York? The system of voting must stand or fall in its entirety. That question was fully briefed and argued at length by counsel for all parties in the *Mooney* case. We doubt very much whether the Court of Appeals, having heard full argument on this question, would have permitted a proposition on proportional representation to be submitted to the voters which was unconstitutional in its entirety.

Subsequent to the decision in the *Mooney* case a second proceeding, *Matter of Mulville* v. *Cohen*, was commenced, in which one of the petitioners in this proceeding appeared as attorney for the petitioner. This proceeding sought to prevent the submission to the voters of the question of proportional representation upon the ground that it was unconstitutional for the very reasons cited herein, and was based on the premise that the decision in the *Mooney* case covered only the question of the right to submit the new charter, and not the separate question of the constitutionality of proportional representation. The application for an order of

mandamus in the *Mulville* case was denied by Mr. Justice Collins at Special Term, New York county, in a decision appearing in the New York Law Journal on October 23, 1936, page 1325.

Thereafter, in order to remove any doubt on the subject, the board of elections made a motion in the Court of Appeals to amend the remittitur in the *Mooney* case so as to state specifically that the separate question of proportional representation had been passed upon. This motion was granted by the Court of Appeals. (272 N. Y. 597.)

The leading authority in support of the proposition that the Court of Appeals will not permit a proposition void in its entirety to be submitted to the people on referendum is *Matter of Tierney* v. *Cohen* (268 N. Y. 464). In that case, the Court of Appeals had before it the validity of a local law to be enacted by referendum authorizing the erection and financing of a municipal power plant. The proposition was attacked on the ground, among others, that the method of financing provided for by the proposed local law was invalid. The city in that case urged that " the applications for mandamus are premature and the issues sought to be raised [the validity of the scheme of financing] are not properly before the court at this time." (268 N. Y. 464, at p. 466.) Yet, the Court of Appeals said (at p. 468): " The primary question involved on this appeal is whether that local law is void. If it is, then the other questions argued are of secondary importance."

The court went on to hold that the local law provided an illegal method of financing, and ordered the referendum stricken from the ballot.

Furthermore, at the very same time that the Court of Appeals had before it the question of the submission of proportional representation at the forthcoming election in the *Mooney* case, it granted an order of mandamus restraining the board of elections from submitting to the voters the question generally known as the Firemen's " Three Platoon System," on the ground that that proposal was unconstitutional. (*Matter of Osborn* v. *Cohen*, 272 N. Y. 55.) In that case the sole ground raised by the defendant board of elections and argued in the Court of Appeals on its behalf related to the propriety of passing upon the question of constitutionality of an act in advance of its adoption by the voters, in a mandamus proceeding. (272 N. Y. 55, at p. 57.) The intervenor representing the firemen, on the other hand, argued that the act as a whole was constitutional. The Court of Appeals, wholly disregarding the city's argument, held that the act in question in its entrety violated the Home Rule Amendment of the Constitution.

Thus, wherever a single inseparable piece of proposed legislation relating to a single subject-matter is to be submitted to the voters, the court will scrutinize the entire act and will not permit it to be submitted if as a whole it is unconstitutional. The court will not permit a public election on a wholly void proposition. But this does not mean that, where a comprehensive document containing separate provisions relating to different subject-matters is submitted to the court prior to its adoption, the court will pass in advance upon the constitutionality of each separate provision. If the document as a whole is constitutional, the validity of specific sections, which do not affect the validity of the whole, will, of course, be reserved until they are properly presented.

The only question before the court in the *Mooney* case, so far as the separate proposition under chapter 43 was concerned, was the constitutionality of proportional representation, the very question presented in this proceeding. In permitting the submission of this separate proposition to the voters, the Court of Appeals may have intended to hold it to be constitutional. In any event, under the circumstances any doubts which exist as to the constitutionality of proportional representation should, after the recording of the mandate of the people at the election, in accordance with the submission directed by the Court of Appeals, be resolved in favor of its validity.

The motion for a peremptory order of mandamus is denied as a matter of law, and not in the exercise of any discretion. Settle order.