OPINION TO THE GOVERNOR.

APRIL 11, 1939.

April 11, 1939.

To His Excellency, William H. Vanderbilt,
Governor of the State of Rhode Island
and Providence Plantations:

We have received from your excellency a request for our written opinion on the following questions of law:

"(1) Are the provisions of sections 35 to 56 and 66 to 68 of S-64 now pending in the Senate and

·House, entitled 'An Act to Revise, Consolidate and Amend Chapter 598 of the Public Laws of 1866 Entitled 'An Act to Revise, Consolidate and Amend the Act Entitled 'An Act to Incorporate the City of Providence' and the Several Acts in Addition thereto and in Amendment Thereof' and the Several Acts in Addition Thereto and in Amendment Thereof' in violation of the Constitution of Rhode Island or of the United States?

" (2) Are the provisions of sections 237 to 249 of said proposed Act in violation of the Constitution of Rhode Island or of the United States?

" (3) If the second question be answered in the affirmative, would said sections 237 to 249 be rendered constitutional by the omission of the words 'Will thereupon become law and' from section 249 line 6 of said proposed Act?"

In compliance with the provisions of article XII, sec. 2 of amendments to the constitution requiring us to give our "written opinion upon any question of law whenever requested by the governor", we have the honor to transmit the following opinion.

Upon receiving your request we were asked by counsel for the charter league for permission to argue the questions and file a brief in support of the constitutionality of S-64. We felt that time would not permit such argument but owing to the public interest in the questions propounded, we granted them permission to file a brief. We gave notice to his honor, John F. Collins, mayor of the city of Providence, of the granting of such permission, and invited him to file a brief in reply, if he so desired. The charter league and Mayor Collins availed themselves of this permission. We received the league's brief on March 23, 1939 and the mayor's brief on March 28, 1939. Both briefs thoroughly discussed the points of law involved, and they have proved helpful in the formulation of this opinion.

Sections 35 to 56 and 66 to 68 of .S-64 provide a system of proportional representation, popularly known as the Hare system, for electing a city council of nine members for the city of. Providence. Sections 237 to 249 provide the machinery for referring the act to the electors of the city for their approval or disapproval by means of an initiative petition to be signed by not less than 10% of the qualified electors as of November 8, 1938, and to be filed with the board of canvassers and registration of the city of Providence any time within twelve months of the approval of the act by the governor. By virtue of certain other sections of the act an entirely new charter is provided by means of which all executive and administrative powers of the city government are vested in a city manager to be elected by the city council.

We shall not attempt to describe in detail the functioning of the Hare system. It is fully described in the opinions of the courts of Michigan and California, cited and discussed *infra*. Suffice it to say that counsel for the league admit that it provides for only one effective vote. In their brief they state: "It is important to note that each voter actually votes for only one candidate"; and again: "No matter how many choices he designates, his ballot will count only once and for only one of his choices." In other words, the system provides that the elector of Providence shall hereafter have the right to cast but one effective vote for one councilman, although the act provides for the election of nine councilmen at large without regard to ward or district lines.

It is also possible, although it may rarely occur, that a voter might have no effective vote at all. Moreover, in the event of any tie vote in certain cases, the determination of the election is taken from the voters entirely and decided by lot. Indeed there is not a little of the element of a lottery in the intricate mathematical system by which the voter's choices are shifted about in the counting.

Whether the system has desirable advantages over our traditional system of voting or whether it has distinct dis-

advantages inherent in it may well be a matter of long and earnest debate in the public forum; but such an argument of policy does not concern us here. We are concerned only with the question of power in the legislature, under the constitution, to establish this system for the city of Providence. We have consequently addressed ourselves to that question, and that question alone.

After careful consideration, involving an earnest and searching examination of the opinions of courts in other jurisdictions in which this system was thoroughly discussed and its constitutionality passed upon in the course of actual litigation, we have reached the conclusion that sections 35 to 56 and 66 to 68 are clearly repugnant to article XX of amendment, section 1 of the constitution of this state. The pertinent part of that section is as follows: "Every citizen of the United States of the age of twenty-one years, who has had his residence and home in this state for two years, and in the town or city in which he may offer to vote six months next preceding the time of his voting, and whose name shall be registered in the town or city where he resides on or before the last day of June in the registration period next preceding the time of his voting *shall have a right to vote in the election of all civil officers and on all questions in all legally organized town, ward, or district meetings.*" (Italics ours)

This language, it seems to us, is clear and leaves no doubt that the electors, when properly qualified, are entitled to vote for all elective officers of the state and for all elective officers within any political subdivision of the state, whether such officers be city, town, ward, or district officers. It is a positive guaranty, expressly written into the constitution, of the right to the full exercise of the elective franchise by the elector, which right the legislature is powerless to take away. By this we do not mean to say that the section prohibits the legislature from prescribing other than elective modes for choosing municipal officers. But we do say that,

whenever the legislature provides for the election of such municipal officers by the people, it is mandatory upon the legislature to accord to every qualified elector the right to vote for each such elective officer in that election in any city, town, ward, or district.

This distinction was pointedly made by this court thirty-six years ago, on March 2, 1903, in its *Opinion to the Governor,* 28 R. I. 629, 630, 631. In passing upon the constitutional power of the legislature to vest the elections of the school committee of the city of Woonsocket in the city council of that city, the court held that the constitution did not require that all civil officers be chosen by a vote of the people, and said: "Neither the words themselves nor the practice under them carry a necessary implication to that effect. The words are not 'a right to vote for all civil officers,' but 'in the election of all civil officers,' in town or ward meetings. They are entirely consistent with the interpretation that they give to all electors the right to vote *for all officers who are to be so elected by the people* under the constitution or by law, other than those specially excepted." And the court said further: "Evidently the constitution has not been understood to guarantee a right to every elector to vote for every civil officer. . . . It recognizes the right of electors *to vote for all officers, who are to be elected by the people,* except as provided, but it does not require that electors shall vote for all officers whose election, under the law, is not to be made by the people." (Italics ours)

This being so, the qualified electors of Providence have a constitutional right to cast a vote for every elective officer authorized by S-64. The act provides for nine councilmen to be elected by the people of Providence, not by wards or districts but at large. Thus these councilmen are to be elected within one political subdivision only. However, by virture of the Hare system, the act accords to the elector only one effective vote for only one such councilman. Manifestly

there are eight other elective officers under the act, in the election of whom the electors are deprived of a vote. How can such a result be harmonized with the clear and explicit language of section 1 of art. XX of amendment to the constitution? Obviously it cannot be done unless the words of that amendment "shall have a right to vote in the election of *all* civil officers" to be elected is changed to read and mean "shall have a right to vote in the election of one only" of such officers. No rule or reason occurs to us to justify such a distortion of plain words.

Such was the view tersely expressed by this court when a question quite like the instant one was propounded to it by the house of representatives in November 1898 and reported in *opinion to the house of representatives,* 21 R. I. 579, 41 A. 1009. In that case the house desired to know if the following act was constitutional: "Section 1. The members of the town council of the town of Cumberland shall be elected upon a general ticket for the entire town, and the names shall not be numbered upon the ballots, and one person only shall be voted for by any one elector.

"Section 2. In counting said ballots the five candidates receiving the highest number of votes shall be declared elected."

While that act did not provide the elaborate mathematical processes for determining the choice of the electors as does the Hare system which is incorporated in S-64, it did, however, provide for only one effective vote for one councilman out of a number of councilmen to be elected at large by the electors of Cumberland. In holding the Cumberland act unconstitutional, the court plainly declared: "It will be readily seen, therefore, that such an act as the one proposed would materially restrict the right to vote thus conferred upon electors, and hence would be clearly unconstitutional." In that opinion the court was considering art. VII of amendment, section 1, which was replaced in the constitution by art. XX of amendment, section 1, with only the word "dis-

trict" added to the pertinent clause of the section which we have discussed.

It is a fundamental rule of construction that ordinary words in a constitution are to be given their usually accepted meaning. In ordinary speech the word *all* does not and cannot mean *only one*. Further, the prohibition of power to limit a right guaranteed by the constitution may be clearly expressed by guaranteeing such right in plain and unmistakable terms. The provision of art. XX, section 1, of amendments, that an elector *"shall have a right* to vote in the *election* of *all* civil officers"* to be voted for at an election, expressly grants the right to vote in the election of *all* such officers, and clearly prohibits the legislature from limiting that right by statute to a right to vote for *only one* of such officers. The word "all", as used in the quoted phrase, admits of no interpretation. It means what it says and it says what it means. Our view is that the proposed system of proportional representation is repugnant to art. XX of amendment, section 1. We are therefore compelled to answer question 1 in the affirmative as to our constitution.

We are confirmed in the view which we take of this system not only because of the opinions of this court above cited and quoted from, but also because of decisions by courts of other states. In those cases, which are actual decisions of litigated issues, the court was confronted with an act of the legislature which had gone into operation and under which the municipalities in question had held or were about to hold elections. Under such circumstances, those courts were bound by the universally recognized rule of construction that they be convinced beyond a reasonable doubt of the repugnancy of the statute to the constitution before declaring it unconstitutional.

In rendering our written opinion in the matter now before us, we are not bound by this rule, as we have not an enactment of the legislature before us but a mere proposal for legislation in the form of a bill. A bill, as such, carries

no intendment in its favor. Nevertheless, we have given it the consideration it would have been entitled to had it been actual legislation.

The following litigated cases from other jurisdictions are of assistance in the present consideration, since such cases pass upon the constitutionality, under the provisions of the constitution of the respective states, of the Hare system of proportional representation as applied in municipal elections. These cases are *Wattles* v. *Upjohn,* 211 Mich. 514; *People, ex rel.* v. *Elkus,* 59 Cal. App. 396; *Reutener* v. *City of Cleveland,* 107 Ohio St. 117; *Johnson* v. *City of New York,* 274 N. Y. 411. In each of these cases it should be noted that the court was required to consider the effect of a home rule amendment to the constitution which it was construing.

In the Michigan and California cases each court, in construing the provisions of its respective state constitution, held that the said system of proportional representation was unconstitutional on the ground that such system does not preserve to each elector his constitutional right to vote for every officer to be elected, but makes his vote effective for one candidate only no matter how many offices are being filled.

The court in the Michigan case arrived at this conclusion although the provision in the Michigan constitution dealing with the right of an elector to vote was much less definite and comprehensive than that in art. XX of the amendments to our constitution, and although the Michigan constitution contained a provision giving to the electors of cities and villages certain limited rights to amend their charters.

From the opinion in the California case it appears that the section in question in the California constitution provides that "every qualified elector shall be entitled to vote at all elections which are now or may hereafter be authorized by law." In discussing this provision, the court, at page 398, used the following language, which seems pertinent to

the question we are passing upon: "The constitutional right to vote would be a barren privilege if the legislature could limit its exercise to one office or one proposition to be voted on. The right to vote 'at all elections' includes the right to vote for a candidate for every office to be filled and on every proposition submitted. The election of nine members of the city council is the election of persons to nine offices as fully as if the offices were distinct in name and in the duties to be discharged, and it is as far beyond the legislative power to limit the elector to the right of voting for one candidate therefor as it would be in the election of state or county officers." The supreme court of California on petition declined to hear the cause, thereby making that opinion final.

The Ohio case, in effect, furnishes support and authority for the views which we have expressed herein. It is true that the court in that case, with one judge dissenting, held that under the provisions of the Ohio constitution the Hare system of proportional representation was constitutional; but that holding was based upon the construction which the majority of the court placed upon a strong home rule amendment to the Ohio constitution. In substance the court held that this home rule amendment, which gave practically unlimited powers of local self-government to cities, modified and limited another provision of the Ohio constitution which provided that a duly qualified elector "be entitled to vote at all elections."

In its opinion the Ohio court distinguished the *Opinion to the House of Representatives,* 21 R. I. 579, 41 A. 1009. In respect to that opinion, the court at page 141 stated: "That case arose under a section of the Rhode Island Constitution which specifically provides that 'each elector shall be entitled to vote in the election of all civil officers', a wording which *necessarily compelled* the opinion rendered. Furthermore, the Rhode Island case did not arise under an unlimited grant of power of local self government." (italics ours) As a matter of fact we have no home rule amendment of any kind in our constitution.

The New York case, by a divided court, held that the Hare system of proportional representation as provided in a charter adopted by the people of New York city under a home rule amendment, was not unconstitutional. While the pertinent clause of the New York constitution is not unlike our own, certain notable factors were present in that case, depriving the opinion of the weight it might otherwise have as an authority on the question before us.

The majority opinion in that case relies strongly upon three principal factors, all of which are conspicuously absent from the matter before us. First, that court felt bound to follow an earlier interpretation of the same constitutional provision, which had held substantially that such clause was intended to prescribe merely the qualifications of an elector to vote *in* an election, and no more. However, in our constitution, a similar provision has been specifically interpreted otherwise, namely, as prescribing not merely the qualifications of an elector to vote *in* an election, but as guaranteeing him a right to cast an effective vote in the election of *all* officers to be elected within his city, town, or ward meetings, or elections. *Opinion to the House of Representatives,* 21 R. I. 579.

Second, the New York court found that there was a long acquiescence in a similar system of minority representation in certain elections in New York city without any challenge on constitutional grounds having been made by those who would be expected "to attack any fundamental principle of municipal government which was wrong." However, in our state, no such acquiescence or contemporary construction of the constitution appears; but, on the contrary, the exact opposite actually exists.

Third, the New York court was confronted with the existence of a home rule amendment to the constitution, and a specific adoption thereunder, by the votes of the electors of New York city, of a charter which included provision for limited or proportional representation. Naturally in such

circumstances that court was reluctant to set aside these solemn acts of approval by the people. Moreover, in applying a general rule of constitutional construction the court was bound to conclude that such charter provision was not repugnant to the New York constitution, unless such a fact was shown beyond a reasonable doubt.

The matter before us, however, presents a mere proposal for an act and not one that has been passed by the legislature and has been approved by the governor. Further, the proposed charter providing for the Hare system of proportional representation has not been adopted by the voters of the city of Providence. And finally, as previously stated, we have no home rule amendment at all to our constitution, but rather a history that points in the opposite direction. See *City of Providence* v. *Moulton,* 52 R. I. 236; *Horton* v. *City of Newport,* 27 R. I. 283. Therefore, we are not confronted with any presumption of the constitutionality of the act, nor with the rule that we must reach our conclusion of its unconstitutionality beyond a reasonable doubt. The presence of these important factors in the New York case and the actual existence of contrary factors in this state, clearly distinguish that case from the question which we are called upon to decide. In view of these vital differences we are of the opinion that the New York case cannot be considered as an authority on the question involved here and we decline to follow its conclusion. The matter before us must be decided under the constitution, history and reported opinions in our state.

It is also to be noted that another provision in our constitution is art. X, section 1 of the amendments thereto, which reads as follows: "In all elections held by the people for state, city, town, ward or district officers, the person or candidate receiving the largest number of votes cast shall be declared elected." Under this provision further serious questions are raised by the sections of the proposed act referred to in question 1. However, we need not discuss these

additional difficulties in detail as we have already answered question 1 in the affirmative, on the ground that the Hare system of proportional representation provided for in the proposed act is clearly repugnant to art. XX of the amendments to our constitution.

Questions 2 and 3 concern sections 237 to 249 of S-64. Sections 237 to 248 provide generally for the manner of initiating and holding a referendum. Section 249 provides that: "If at any such special election as provided for in this chapter a majority of the voters of Providence actually voting in said special election shall vote "yes" on the proposition submitted to them as hereinbefore provided, in section 246 hereof, *then this act will thereupon become law and will go into effect* for the purpose of the election of a council under this charter forthwith . . . ." (italics ours) We have not given to the subject matter of these questions all of the research and study which we have devoted to the matters just decided, because we have interpreted questions 2 and 3 as being largely dependent upon question 1, which we have answered.

However, in its present form and without substantial amendment, particularly of section 249, we are disposed to answer question 2 in the affirmative. S-64 in its present form does not purport to be a completed act by the legislature in performance of its legislative function under the constitution. By its terms the entire act could never become a law until a specified referendum was held, and that referendum could not be held until the act became a law. It is also open to objection that it attempts an improper delegation of the legislative power in clear violation of the constitution. Art. IV, sec. 2. Therefore, question 2 is answered in the affirmative.

We do not mean by this to give the opinion that the legislature may not, in proper cases and by proper language, pass a valid and completed enabling act which would permit a municipality to take advantage of its terms provided that

municipality fulfilled or satisfied the conditions. therein imposed by the legislature. One of these conditions might well provide for a referendum to the people before the municipality could take advantage of the terms and provisions of the act and before any proposed charter could become effective and operative. All that we now say is that the proposed act in its present form, particularly in section 249, does not satisfy the constitutional requirements relating to the proper performance of the legislative function. This is apparently conceded by. the brief submitted on behalf of the charter league which says: "It (the act) should, of course, be amended so as to provide that it becomes law on passage and that only its going into effect (in Providence) would be dependent on the referendum."

Question 3 seems to us to be in the nature of a request for advice upon methods of drawing or amending a legislative act rather than one for an opinion upon a question of law. The correction which is suggested in question 3 relating to line 6 of section 249 may go far to cure the constitutional or related defects, but it would not then be free of all obscurity. From what we have said in reply to question 2, we think that we have answered the substance of question 3 and therefore we make no categorical answer thereto.

Therefore, to summarize, we answer questions 1 and 2 affirmatively with relation to the constitution of Rhode Island; and having so answered them, it becomes unnecessary to consider these questions with reference to the constitution of the United States. Having answered in question 2 the substance of question 3, the latter is passed for the reasons above stated.

EDMUND W. FLYNN
ANTONIO A. CAPOTOSTO
HUGH B. BAKER
FRANCIS B. CONDON

To His Excellency, William H. Vanderbilt,
Governor of the State of Rhode Island
and Providence Plantations:

I am unable to agree with my associates in their answer to the first question submitted to us. It is well settled that in the case of a legislative act by a state legislature the presumption is in favor of the validity of such act, and that in order for it to be declared invalid for inconsistency with the state constitution it must be shown to be clearly contrary to a provision in that constitution. I do not believe that the inconsistency must be clear *beyond a reasonable doubt* in the case of an advisory opinion, though it must be so when the question arises in a litigated case. But it must be at least reasonably clear and a finding of such inconsistency must not be arrived at by giving to the constitutional provision or to the act an interpretation which is in any degree strained or forced.

The reason for applying these rules in this state and with respect to the proposed act now before us is particularly strong and clear, by reason of three considerations. One of these is art. IV, sec. 10 of the constitution of this state, as follows: "The general assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution."

Another of these considerations is that by the charter from King Charles II, which was in effect until the present constitution was adopted, power and authority were granted to the general assembly "to regulate and order the waye and manner of all elections to offices and places of trust."

A third consideration is that in 1831, while the charter was in force and effect, the general assembly, by an act which did not go into full operation until approved by the voters of the town of Providence in accordance with provisions of the act, made that town into a city and gave it a charter; that in sec. 8 of that charter it was provided that for the purpose of holding elections, the city should be divided into

six wards, "to contain, as nearly as may conveniently be, an equal number of freemen"; and that this charter also provided for the election of four councilmen and one alderman from each of these wards.

To my mind it is clear from that action that at the time when this constitution went into effect the general assembly had theretofore exercised under the charter the general power of regulating the "waye and manner" of elections to offices in the city of Providence, including the election of four councilmen in each of the six wards into which the city was to be divided under that charter.

From this and the previously mentioned considerations it necessarily follows that such power of regulating the way and manner of election to offices in any city or town in the state, including the method of electing "at large", within each ward of a city or from the whole city, a plural number of members of a city council, continued to be lodged in the general assembly under the constitution, "unless prohibited in this constitution."

In the advisory opinion in *In re The Constitutional Convention,* 55 R. I. 56, at page 66, all the present members of this court joined in the statement that the word "prohibited" in art. IV, sec. 10, of the constitution of Rhode Island "is a strong word and in our judgment is not satisfied by anything short of a prohibition that is clearly, definitely and necessarily implied, even if it does not require that the prohibition be express"; and we applied that statement further on in the opinion.

There is no doubt that the members of an official body like a city or town council, composed of a number of members, may, under authority given by the general assembly, be elected at large, instead of being severally elected from wards or voting districts, into which the city or town is divided. There is nothing in the constitution to prevent this; and it has from time immemorial been a very common way of electing the members of town councils.

The basic question, then, is whether there is any provision of the Rhode Island constitution which expressly *or by clear and definite and necessary implication,* requires that, in every case of an election at large of members of such a body, each qualified voter must have the right to vote for as many persons as the number of persons who are to be elected to that body. If there is such a provision in our constitution, an act of the general assembly which provides for any other method of the election at large of the members of such a body is *prohibited* by the constitution. I am not aware that the constitutionality of the provisions for election of the city council of Providence by the Hare system of proportional representation, in the proposed act now before us, is seriously attacked on any other ground.

One of the provisions of the constitution which is relied upon by those who have argued for the unconstitutionality of the act in question is art. X, section 1 of the articles of amendment, as follows: "In all elections held by the people for state, city, town, ward or district officers, the person or candidate receiving the largest number of votes cast shall be declared elected." This section was added to the constitution in 1893, in substitution for art. VIII, sec. 10 of the original constitution, which read as follows: "In all elections held by the people under this constitution, a majority of all the electors voting shall be necessary to the election of the persons voted for."

Apparently it was not quite clear whether this earlier provision applied to local elections; and it seems to me to be the only reasonable conclusion that the sole intent and purpose of the amendment was to do away with the requirement of election by a *majority* of all the votes cast by qualified voters, to substitute the more usual method of election by plurality, and to make sure that this latter method would apply to all elections of *local* officers, as well as to all elections of *state* officers. In my judgment the amendment should be construed accordingly. In my judgment, also, it

is clear that the above section in the original constitution, requiring a majority to elect, could have had no reasonable application to the election *at large* of the members of any official body; and I cannot see how the section as amended can reasonably be construed as requiring that in every election *at large* of such members of a body each qualified voter shall have the right to cast as many votes as there are members to be elected.

Of course if the body is composed of distinct and separately designated memberships, as where four members, designated and voted for as "first councilman", "second councilman", *etc.*, for instance, are to be elected, the section would necessarily require that, in order to be elected to one of these positions, a man must have received more votes for that particular position than any other person received *for that position*.

But if the memberships in the council or other such body are indistinguishable, then, in my judgment, all that is required by the section is that each person elected to membership must have received more votes than any of the persons not elected; and it cannot reasonably be construed as governing, in any way, the number of persons for whom each qualified elector may vote or in what manner he shall vote or how the votes cast shall be counted in order to determine the persons elected to membership in the group. This section would leave those matters to the control of the general assembly.

It may be advisable, at this point, to discuss briefly a contention made by some who are of the opinion that the Hare system of proportional representation is unconstitutional because inconsistent with the requirement of election by pluralities. Under that system the process of shifting votes, from candidates who have attained the quota or whose attainment of it is hopeless, to other candidates who have not yet attained the quota but who still have a chance to attain it, ceases as soon as the number of those who have

attained the quota reaches the number of positions to be filled.

The contention, if I understand it correctly, is that it is contrary to the requirement of election by pluralities to have the shifting of votes stop at the above point of time, because, if it were continued, one or more of the other candidates might later attain the quota. But it is clear, to anyone who understands the rather simple mathematical calculations involved, that the required method of determining the quota, when all the votes have been cast, is such that when, in the process of shifting votes, the quota, and only the quota, has been attained by persons equal in number to the positions to be filled, the total of the remaining votes, not counted for these winners, is less than the required quota. I have personally verified this statement to my entire satisfaction.

The result of the truth of this statement necessarily is that no further shifting of votes could result in giving another candidate as many votes as had been counted for each one of the successful candidates. This result would be in complete accordance with the requirement of election by pluralities, when applied to an election, *at large,* of a group of officers, like a city council, for instance.

Another result of the application of the Hare system of voting would necessarily be, that, with the exception of the comparatively small number of voters whose votes were not counted for any winning candidate, a number which would be less than the quota, every voter would have an *effective and equal* part in the selection of the group of officers to be elected. The proportion of voters whose votes would be ineffective under this system would clearly be very much less than the average proportion of such ineffective voters would be in an election at large of a group of officers, with each voter entitled to cast, and to have counted, as many votes as there are positions to be filled.

I am convinced that there is nothing in the proposed act

which is inconsistent with art. X, section 1 of amendments to the Rhode Island constitution.

The other provision of the constitution that is relied on by those who contend that the proposed act is unconstitutional, being the only provision on which the other members of this court base their opinion sustaining that contention, is the first section of art. XX of amendments. The first paragraph of that section is set forth in full in that opinion and need not be here repeated in full. It states that every citizen of the United States who satisfies certain stated requirements "shall have a right to vote *in the election of* all civil officers and on all questions in all legally organized town, ward, or district meetings;" it does not say "a right to vote *for* all civil officers", and this difference is important. (italics mine)

This paragraph is followed by five provisos which qualify it. The first of these is the only one which I think we should now consider. In substance it provides that no person shall "be allowed to vote upon any proposition to impose a tax or for the expenditure of money in any town, as distinguished from a city", unless such person shall have certain additional qualifications therein stated.

This amendment was adopted in 1928 in substitution for art. VII of amendments, which was adopted in 1888 and section 1 of which stated that every adult male citizen of the United States satisfying certain requirements of residence and registration "shall have a right to vote in the election of all civil officers and on all questions in all legally organized town or ward meetings: *Provided,* that no person shall at any time be allowed to vote in the election of the city council of any city, or upon any proposition to impose a tax or for the expenditure of money in any town or city, unless he shall within the year next preceding have paid a tax assessed upon his property therein, valued at least at one hundred and thirty-four dollars."

This art. VII of amendments was adopted in substitution for secs. 2 and 3 of art. II of the original constitution. The former of those sections, being the only one pertinent to the present matter, stated that after the year 1843 every male citizen of the United States satisfying certain numerous and onerous requirements as to age, residence, payment of taxes and the like, more numerous and onerous than those stated in art. VII of amendments, "shall have a right to vote in the election of all civil officers, and on all questions in all legally organized town or ward meetings." That language was the same as that above quoted from art. VII of amendments; and it was followed by a proviso substantially the same as the one above quoted from that article of amendment.

The first section of that art. II of the constitution stated that every citizen of the United States who had the general qualifications for voting in the town or city of his residence and owned real estate of a certain value therein should "have a right to vote in the election *of all civil officers* and on all questions in all legal town or ward meetings so long as he continues so qualified." It then stated that if such estate was within this state but outside of that town or city, he should "have a right to vote in the election of all *general* officers and members of the general assembly" in the town or city of his residence. (italics mine)

The intent evidently was to distinguish between voters qualified to vote in the election of all kinds of civil officers, including local as well as state officers, and those qualified to vote in the election of state officers only. This throws much light on the intended meaning of the words "all civil officers" in sec. 2 of the same article and in the later amendments above described.

That same art. II of the constitution contained a sec. 6, still in full force and effect, as follows: "The general assembly shall have full power to provide for a registry of voters, *to prescribe the manner of conducting the elections,*

the form of certificates, the nature of the evidence to be required in case of a dispute as to the right of any person to vote, and *generally to enact all laws necessary to carry this article into effect,* and to prevent abuse, corruption and fraud in voting." (italics mine)

Reading and carefully considering that whole article II of the constitution and especially the parts above mentioned, it is about as clear to my mind as anything can be made that its first five sections expressed only one intent and cannot reasonably be interpreted otherwise. That intent was to prescribe *certain* qualifications as being necessary and sufficient for voting *in the election of all kinds* of civil officers, and on all kinds of questions, in all legally organized town or ward meetings, with two specific exceptions. The first of these was that for voting in the election of the city council of the city of Providence and for voting upon any proposition to impose a tax, or for the expenditure of money in any town or city, a certain *additional* qualification should be necessary. The second was that if a voter had a right to vote because of ownership of certain real estate located outside the town or city of his residence, he could only exercise that right in the election of *general officers* and of members of the general assembly in that town or city.

I cannot see any good reason for giving any other and wider interpretation to the language of sec. 2 of that article. To interpret it as requiring also that every person duly qualified to vote in the election of the city council of the city of Providence be given the right to cast as many votes as the number of members to be elected, if they are all to be elected at large, is in my judgment to go far beyond the express language of the section and far beyond any clear, definite and necessary implication from that language.

To arrive at such an interpretation would, in my considered judgment, clearly involve a finding that when a city council composed of nine members, for instance, is elected at large in a city, with no distinctions among its member-

ships, *nine elections* are held, in each of which every quali-
fied elector is entitled to cast a vote, and not *one* election of
*nine* members. I am fully convinced that such a finding
would not be required by the language of that section or by
any clear, definite and necessary implication therefrom.
There might be *some* excuse for such a finding, if the words
of the section were "a right to vote *for* all civil officers", but
I can see none when the words are "a right to vote *in the
election of* all civil officers." When such a city council is
elected at large, it is *one* election of nine officers; and an
elector voting therein by the Hare system is fairly described
as voting in the election of all nine officers.

Whether, in an election at large, of the members of such
a body, a qualified voter is to have the power to cast as many
votes as there are members to be elected or to cast only a
less number of votes, or whether, if he can cast several votes,
he can cast more than one of them for a single candidate
and how the votes are to be cast and how counted are all,
in my judgment, questions as to the *manner of conducting*
the election; and by section 6 of art. II of the constitution
the general assembly is given full power to decide such ques-
tions. The only limitation which I can see to this power in
the general assembly is one that is inherent in the nature
of the case, *viz.*, that all voters who are equally qualified to
vote in any election must be given equal voting rights.

In the sections, above referred to, of articles of amend-
ment dealing with this subject of qualifications for voting
in elections, I can find nothing to justify any different con-
clusion from that which I have reached, as stated above,
with respect to the proper interpretation of the language of
the first two sections of art. II of the original constitution.

It is not denied by anyone that the general assembly
could provide that the city of Providence should have a city
council of nine members, whose powers and functions would
be indistinguishable and who could act only as a body; and
that it could provide that the city be divided into nine wards

and that the voters of each ward should at the same time elect to this council one member by a plurality of the votes. It is admitted by all that this would not be inconsistent with the constitution, although, by that method of election, no voter of the city would be permitted to vote for more than *one* person for the council. Yet it is contended that if, for the same council, the nine members are to be elected at large, every voter *must* have the right to vote for *nine* persons for the same council. To my mind there is such a fundamental and clear inconsistency between these two conclusions that it can be justified only by language that necessarily and beyond any reasonable doubt *compels* the latter conclusion to be reached. I can find no such language in the constitution of this state.

It is true that there is an advisory opinion of the seven members of this court in 1899, in which they reached a conclusion opposite to that which I have above stated. *Elections By Proportional Representation*, 21 R. I. 579. The proposed act of the general assembly there involved was as follows: "Section 1. The members of the town council of the town of Cumberland shall be elected upon a general ticket for the entire town, and the names shall not be numbered upon the ballots, and one person only shall be voted for by any one elector. Section 2. In counting said ballots the five candidates receiving the highest number of votes shall be declared elected."

The part of the opinion that follows immediately after the quotation of the proposed act and is the only part that is pertinent and important in the present matter is as follows: "We are of the opinion that such an act would not be constitutional. Section 1 of article 2 of the constitution confers upon the persons possessing the qualifications therein specified the right to vote in the election of *all* civil officers . . . and section 1 of article 7 of the amendments to the constitution also confers upon all persons who shall be qualified in accordance with the provisions thereof the right to vote

in the election of *all* civil officers .... It will be readily seen, therefore, that such an act as the one proposed would materially restrict the right to vote thus conferred upon electors, and hence would be clearly unconstitutional." The judges were responsible for the italicizing, which tended, in my judgment, to alter the meaning of the text.

The opinion contains no reasoning whatever; but it is obvious to me that the judges could only have reached their conclusion by interpreting the language of these sections of the constitution as clearly having the same meaning and effect as a section stating that each qualified elector shall have the right, in all elections of civil officers, to cast a vote for some one for every position to be filled. To be more specific, it is clear to my mind that in order to reach such a conclusion, from the language on which it is based, the judges must have been of the opinion that a provision in a constitution that a person having certain qualifications shall have the right to vote *in* the election of a city council means, clearly and necessarily, that such person shall have the right, in such an election, to vote for as many persons as there are memberships in such council, even where the memberships are indistinguishable from each other.

In my judgment to give this section of the constitution such an interpretation is to do violence to its language, especially in view of the fact that in the same article of the constitution was a provision that the general assembly shall have full power to prescribe the manner of conducting the elections.

The rule of *stare decisis* does not apply to an advisory opinion, which, as Ames, C. J. said in *Taylor* v. *Place,* 4 R. I. 324, at 362, "though it may afford much light, from the reasonings or research displayed in it, can have no weight as a precedent." See also *Allen* v. *Danielson,* 15 R. I. 480; *In Re Election of United States Senators,* 41 R. I. 209; *Opinion to the Senate,* 51 R. I. 322; *In Re The Constitutional Convention,* 55 R. I. 56, at 68. After giving all due

consideration to the ability, fairness and sincerity of the judges who joined in the opinion just discussed and to what they said therein, I am convinced that the opinion was not correct.

My associates, in their opinion, rely upon another advisory opinion of the judges of this court, given in 1903, *Opinion to the Governor*, 28 R. I. 629. That involved the same section of the constitution as is now under discussion, stating that every person possessing certain qualifications "shall have a right to vote in the election of all civil officers." The sole question was whether from that language it was "a necessary implication" that every elector had the right to vote for all civil officers, so that all such officers must be chosen by the people. The judges agreed that there was no such implication, and in my judgment the opinion was clearly correct and does not contain anything inconsistent with what I believe to be the correct answer to the question now under discussion.

Outside of this state there are quite a number of reported cases in which the question of the constitutionality of the election at large of city councils in accordance with the Hare system of proportional representation has been decided. In some of these the question has been decided in the affirmative and in some in the negative. Most of them have been discussed in the opinion of the other members of this court. In the earlier cases the question has been answered in the negative and I shall not comment on them, except to say that the reasoning in the opinions in those cases is not convincing to me, because it seems to me that in each case the court gave to a provision of the constitution, with regard to qualifications of voters, an interpretation which was not within the scope of the provision and was not required by its express language or by any clear, definite and necessary implication therefrom.

In each of the two later cases, which have been in the highest courts of Ohio and New York, the decision has

been in favor of the validity of a charter provision for the election at large of members of a city council by proportional representation. The earlier of these cases is *Reutener* v. *City of Cleveland,* 107 Ohio St. 117, sustaining a charter provision for the election of members of a city council. After describing the Hare system the court, at page 137, stated the question as follows: "Does the fact that the elector under this system votes a first choice for one officer only, there being from five to nine to be elected in the district, violate the provision of Section 1, Article V of the Constitution, that every elector shall be entitled to vote *at all* elections?"

The court answered that question in the negative. One ground that it gave for its decision was based on the home rule provision of the Ohio constitution; but before stating and discussing that ground, it had stated, with evident approval, a different ground, *viz.,* that to answer the above question in the affirmative would require an extension of the plain language of the above-mentioned section of the constitution.

This it did in discussing the following decisions made and applied by the same court, under that same section of the constitution, in an earlier case: "2. Where an office is filled by an election, the election must conform to the requirements of the constitution, and each elector of the district is entitled to vote for a candidate for each office to be filled at the election. 3. A statute authorizing the election of four members of the police board at the same election, but which denies to an elector the right to vote for more than two members is in conflict with article V of the constitution." *State ex rel.* v. *Constantine,* 42 Ohio St. 437.

As to that case and the above decisions therein the court, in the *Reutener* case, after stating that the cases were not greatly differentiated, said: "*State, ex rel.,* v. *Constantine,* however, extended the plain language of the constitution far beyond the word-meaning of the provision in Section 1,

Article V. To the clause, shall 'be entitled to vote at all elections,' the *Constantine case* added the clause, and 'for a candidate for each office to be filled at the election.'" I am convinced that the judges in the Rhode Island case of *Elections By Proportional Representation, supra,* in the same way and by adding a similar clause, "extended the plain language of the constitution far beyond its word-meaning."

The latest decision that I know of on this question, which was made by a court of as high standing as any in the country, the court of appeals of the state of New York, is *Johnson* v. *City of New York,* 274 N. Y. 411. The opinion there reported covered four cases, in all of which the decisive question raised was whether chapter 43 of the "New Charter" of the city of New York, which provided for the election of councilmen by proportional representation under a system closely similar to the Hare system, was unconstitutional.

Its constitutionality was contested by reason of section 1 of article 2 of the state constitution, which stated that every citizen possessing certain qualifications shall be entitled to vote at any election in the election district of which he or she shall at the time be a resident, and not elsewhere, "for all officers that now are or hereafter may be elective by the people, and upon all questions which may be submitted to the vote of the people . . . ." In my judgment the decisive language of that section was less favorable to election by proportional representation than the language of the corresponding section of the constitution of Rhode Island, because the right stated in the former was to vote "for all offices", while in the latter it is to vote "in the election of all officers." Yet the charter provision in question was held to be constitutional, as not being inconsistent with that controlling section of the New York constitution.

Before discussing further the opinion of the court of appeals, I wish to comment briefly on the opinion of a jus-

tice of the supreme court of New York, special term, New York county, in deciding one of the four cases which were taken to the court of appeals and disposed of by the opinion in *Johnson* v. *City of New York, supra.* That opinion in the supreme court is reported in *Matter of Bowe* v. *Cohen,* 162 Misc. 913; and I am discussing it simply because the reasoning in it is in my judgment very clear and convincing.

There the court, after quoting the section of the constitution which is stated and quoted from *supra,* said, at page 917: "The argument that this provision is violated by the system of proportional representation is based upon an apparently strained interpretation of its intent and meaning . . . . Yet there is nothing expressly in the section which prescribes any particular method of voting or of counting votes. On the contrary, so long as all citizens are given an equal right and power to vote in all elections at which any public officers are to be elected, it would seem that the provisions of the section were amply complied with. The precise manner of voting or counting votes is immaterial. As was held by the Court of Appeals in the case of *Spitzer* v. *Village of Fulton* (172 N. Y. 285, at p. 289): 'The obvious purpose of that article was to prescribe the general qualifications that voters throughout the State were required to possess to authorize them to vote for public officers.'"

It is clear to my mind that all this reasoning is applicable to the question now before the members of this court under the similar provision of the Rhode Island constitution, and is irrefutable. It was virtually adopted by the court of appeals in *Johnson* v. *City of New York, supra,* in the opinion by the chief judge, in which four of the other six judges of the court concurred, only one judge dissenting.

Is seems to be the view of my associates that the conclusion arrived at in that opinion was mainly based on the fact, to which the court called attention, that some forms of minority representation, by special methods of voting, had been practiced in that state from an early date and some

of them had continued for long periods and the question of their constitutionality had not been litigated. But a very careful reading of the opinion has convinced me that no great weight was given to the fact by the court in sustaining the validity of the charter provision in question.

As to the matter of the home rule amendment to the constitution the court, at page 431, definitely refused to sustain the validity of the charter provision on the ground of the adoption of that amendment. It then definitely decided that for the reasons previously stated, which were based on the interpretation of the pertinent provision of the constitution, "chapter 43 of the new charter of the city of New York, relating to proportional voting, is not proscribed by article II, section 1."

In the beginning of the opinion of the court the chief judge said, in substance and effect, that assuming that the borough of Brooklyn was entitled to twelve councilmen, it was conceded that it could be divided into twelve districts and one councilman elected from each district; that this would give that borough twelve representatives in the council and yet no elector could vote for more than one out of the twelve; but that it was contended that if the artificial lines creating the districts were removed and twelve men were to be elected at large, every voter must be allowed to vote for twelve men.

In answering this contention, the court said, at page 417: "The only reason pressed upon us for this artificial distinction is that the Constitution says it must be, and this is final. I can find no such command in the State Constitution, and the authorities, so far as the matter has come into court, and the practice in electing Supervisors and Aldermen, the predecessors of Councilmen, in New York City for over thirty years, has been to the contrary."

The court then reviewed the different changes made in the provision of the New York constitution as to qualifications for voting, which was the provision relied on by the

opponents of proportional representation. The pertinent language of that section was very similar to the language of the corresponding Rhode Island provision, except as above pointed out, and the changes made from time to time were very similar and were all in the direction of liberality. At page 418 the court said that no one could read the history of these changes without realizing that the object of the changes was to remove the disqualifications which attached to the voter and to make the requirements uniform.

Then, at page 424, the writer of the opinion summed up thus his conclusion on the main question: "To me it seems evident from what I have quoted that article II, section 1, does not prevent a system of minority representation or proportional voting such as is here presented. Reason likewise points out that if the law permits a borough to be divided into districts, and the people of the borough thus forced to vote for only one Councilman in each district, it is equally permissible to elect the same number from the entire borough, each voter selecting but one."

Because the main question in that case was substantially the same as the main question now before the members of this court and because of the grounds and reasoning upon which the charter provision for proportional representation was there held constitutional, that case is, in my judgment, a very strong authority indeed in favor of a conclusion that the proposed act of the general assembly of this state, now under discussion, would not be unconstitutional on the ground that it would provide for elections by proportional representation.

I find nothing in the constitution of the United States with which the proposed act is inconsistent; and such inconsistency does not appear to be seriously contended for by anybody.

For the reasons which I have above stated, my opinion is that the first of the above questions propounded to the judges of this court should be answered in the negative. As

to the other two questions, I do not disagree with the answers made to them by my associates.

WILLIAM W. MOSS.

Brief submitted by *Daniel E. Geary*, City Solicitor; *John T. Walsh*, Assistant City Solicitor, on behalf of John F. Collins, Mayor of City of Providence.

Brief on behalf of Charter League, *Amici Curiae*, submitted by *Edward S. Brackett, Jr., Gerald W. Harrington, Isadore Paisner, Louis B. Rubenstein, Benjamin R. Sturges, Henry A. Tuell, Edward Winsor, Lee A. Worrell.*