**In re ADVISORY OPINION TO the GOVERNOR (ETHICS COMMISSION).**

No. 91–577–M.P.

Supreme Court of Rhode Island.

June 10, 1992.

Judith Colenback Savage, Office of the Governor, William P. Robinson, III, Edwards & Angell for Governor.

Gary Yesser, Ethics Com'n, Rae B. Condon, James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., Aaron L. Weisman, Sp. Asst. Atty. Gen., A. Gregory Frazier, ACLU, Lauren E. Jones, Common Cause, Edward M. Fogarty, House of Representatives, Frederick Cass, Michael K. Marran, Providence, amici curiae.

To His Excellency Bruce G. Sundlun, Governor of the State of Rhode Island and Providence Plantations.

We have received from Your Excellency a request for our written opinion in accordance with article 10, section 3, of the Rhode Island Constitution on three specific questions relating to the so-called ethics amendment as contained in article 3, sections 7 and 8. The members of this court have been asked to determine (1) whether article 3, section 8, of the Rhode Island Constitution confers upon the Rhode Island Ethics Commission (commission) the power, independent of the Rhode Island General Assembly, to enact substantive ethics laws governing all elected and appointed officials and employees of state and local governments, boards, commissions, and agencies or whether instead the commission derives its power to regulate from legislative enactments of the General Assembly; (2) whether article 3, section 8, divests the General Assembly of some or all of its legislative powers to enact ethics laws governing public officials and employees and instead vests that power in the commission; and (3) whether article 3, section 8, is valid under the United States Constitution and consistent with the Rhode Island Constitution if it is interpreted to confer upon the commission the power to enact substantive ethics laws governing public officials and employees, independent of and/or to the exclusion of the General Assembly.

In circumstances similar to those in Rhode Island's most recent history, the years preceding this state's 1986 constitutional convention were marked by scandal and corruption in both state and local government. As a result the overwhelming majority of Rhode Island's citizens were at the very least distrustful of their elected and appointed officials and of government as a whole. In response to public outcry for reform at all levels of government, an ethics committee was set up as part of the constitutional convention and given the task of examining unethical governmental conduct and proposing measures to bring about ethical reform that would ultimately restore the public trust.

The ethics committee deliberated throughout the spring of 1986. On June 26, 1986, with the committee's recommendations before them, the convention delegates voted to submit to the electorate Resolution No. 86–00060 (Sub A) regarding ethics in state government.[1] An official voters' guide explaining fourteen ballot questions, including question 6 pertaining to ethics in government, was sent to each voter household.[2]

In November 1986 the electorate of the State of Rhode Island spoke out and approved the ethics amendment whereby an independent non-partisan ethics commission would be formed to oversee ethics in State Government. Thereafter the ethics amendment was made part of the Rhode Island Constitution as article 3, sections 7 and 8. Specifically section 7 states:

"Ethical Conduct.—The people of the State of Rhode Island believe that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable and responsive, avoid the appearance of impropriety and not use their position for private gain or advantage. Such persons shall hold their positions during good behavior."

Section 8 provides:

"Ethics Commission—Code of Ethics.—The general assembly shall establish an independent non-partisan ethics commission which shall adopt a code of ethics including, but not limited to, provisions on conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure. All elected and appointed officials and employees of state and local government, of boards, commissions and agencies shall be subject to the code of ethics. The ethics commission shall have the authority to investigate violations of the code of ethics and to impose penalties, as provided by law; and the commission shall have the power to remove from office officials who are not subject to impeachment."

In addition to voting on the fourteen ballot questions, the electorate also voted to reaffirm the existing provisions of the Rhode Island Constitution. Among the provisions reaffirmed was article 6, section 10, which provides for the continuation of previous powers of the General Assembly and states: "The general assembly shall continue to exercise the powers it has heretofore exercised, unless prohibited in this Constitution."

The General Assembly was directed by article 15, section 4, to adopt implementing legislation for article 3, sections 7 and 8, on or before June 1, 1988.[3] In response to the constitutional directive, in 1987 the General

---

1.  Resolution No. 86–00060 (Sub A), sections 7(b) through 7(d), states:

    "(b) The general assembly shall establish an independent non-partisan ethics commission which shall adopt a code of ethics including, but not limited to, provisions on conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure. All elected and appointed officials and employees of state and local government, of boards, commissions and agencies shall be subject to the code of ethics.
    (c) The ethics commission shall have the authority to investigate violations of the code of ethics and to impose penalties, as provided by law; and the commission shall have the power to remove from office officials who are not subject to impeachment.
    (d) The general assembly shall adopt implementing legislation on or before June 1, 1988."

2.  Page 10 of the voters' guide Ballot Question No. 6 provided in pertinent part: "ETHICS IN GOVERNMENT * * * Shall an ethics commission be established with authority to adopt a code of ethics and to discipline or remove public officials and employees found in violation of that code?" * * *

    "B. *Ethics Commission:* The general assembly would be directed to establish a non-partisan ethics commission that would enforce a code of ethics for all public officials, state and local, elected and appointed. The commission would have power to investigate charges, impose penalties and to remove officials who are not subject to impeachment."

3.  Article 15, section 4, of the Rhode Island Constitution states, "On or before June 1, 1988, the general assembly shall adopt implementing legislation for Article III, Sections 7 and 8, and for Article IV, Section 10."

Assembly terminated the existence of a pre-existing Conflict of Interest Commission and duly established the fifteen member Rhode Island Ethics Commission. The commission members are appointed by the Governor, ten of whom are selected from lists submitted by the General Assembly. The General Assembly also sought to establish the Rhode Island Code of Ethics in Government as provided in G.L.1956 (1990 Reenactment) chapter 14 of title 36.[4]

On December 17, 1987, the commission adopted and thereafter enforced the code of ethics as set forth in chapter 14 of title 36. However, on August 22, 1991, the commission voted to adopt a resolution declaring that it intended to change the provisions of the ethics code without approval by the General Assembly.[5] Shortly thereafter, pursuant to the Administrative Procedures Act (APA) as contained in G.L.1956 (1988 Reenactment) chapter 35 of title 42, the commission published a notice of intention to amend the existing code of ethics and to conduct a public hearing on November 6, 1991.[6]

The commission's attempted adoption of its own rules and regulations drew sharp criticism from a number of groups. On November 5, 1991, in response to the commission's notice of intent, the Office of the Governor, pursuant to article 10, section 3, of our Constitution submitted a request for an advisory opinion to this court regarding the propriety of the commission's intended action. The Governor's request set forth

three questions of law for this court to address. First, the Governor asked

"[w]hether Article III, Section 8 of the Rhode Island Constitution confers upon the Rhode Island Ethics Commission the power, independent of the legislature to enact substantive ethics laws governing all elected and appointed officials and employees of state and local government, boards, commissions and agencies or whether, instead, the Rhode Island Ethics Commission derives its power to regulate from legislative enactments of the Rhode Island General Assembly."

Second, he asked

"[w]hether Article III, Section 8 of the Rhode Island Constitution divests the General Assembly of some or all of its legislative power to enact ethics laws governing public officials and employees and instead vests that power in the Rhode Island Ethics Commission."

Last, he asked

"[i]f Article III, Section 8 of the Rhode Island Constitution is interpreted to confer upon the Rhode Island Ethics Commission the power to enact substantive ethics laws governing public officials and employees, independent of and/or to the exclusion of the legislature, is that constitutional amendment valid under the United States Constitution and consistent with the Rhode Island Constitution."

Notwithstanding widespread opposition, on November 14, 1991, the commission passed a number of new ethics provisions.[7] There-

---

**4.** General Laws 1956 (1990 Reenactment) § 36–14–1 (as enacted by P.L.1987, ch. 195, § 3). It is noteworthy that § 36–14–9(a)(3) of the statutory ethics code empowers the commission to "[p]rescribe and publish, after notice and public hearings, rules and regulations to carry out the provisions of this chapter."

**5.** The minutes of the ethics commission's August 22, 1991 meeting provide *inter alia*, that the commission voted "[t]o adopt a resolution stating that the Commission has the right, and intends to, change provisions of the Code of Ethics without legislative approval" and "to adopt amendments to the Code of Ethics in a manner parallel to approving regulations through the APA."

**6.** General Laws 1956 (1988 Reenactment) § 42–35–3 provides in pertinent part:

"Procedures for adoption of rules.—(a) Prior to the adoption, amendment, or repeal of any rule the agency shall:
(1) Give at least twenty (20) days' notice of its intended action. * * * The notice shall be mailed to all persons who have made [a] timely request of the agency for advance notice of its rule-making proceedings, and published in a newspaper * * * having aggregate general circulation throughout the state."

**7.** Of the six resolutions adopted by the commission during its November 14, 1991 meeting, resolutions Nos. 36–14–5006 and 36–14–5007 are of particular concern to the commission's opponents. Specifically No. 36–14–5006 provides:

"No elected or appointed official may accept any appointment or election by the body of which he or she is or was a member, to any position which carries with it any financial

after, on November 27, 1991, the commission filed the adopted resolutions with the Office of the Secretary of State to become effective on December 18, 1991.

Briefs were submitted by both the Governor's office and the commission. In addition this court requested that amicus curiae briefs be submitted by all interested parties. In response, additional briefs were submitted by Joseph DeAngelis, speaker of the House of Representatives; the Department of Attorney General; the American Civil Liberties Union; Common Cause of Rhode Island; and Rae B. Condon, a member of the Rhode Island Bar Association.

## I

With respect to the first question of law propounded to this court—whether article 3, section 8, confers upon the commission the power to enact substantive ethics laws independent of the General Assembly—the Governor and other opponents of the commission's power aver that although the constitutional amendment provided for the creation of a nonpartisan ethics commission with the power to enforce ethics laws, it did not provide the commission with the power to make its own substantive ethics laws. Rather they contend that the constitutional amendment merely conferred upon the commission the power to enforce, not enact, a code of ethics.

In support of the foregoing assertion, opponents refer to the language contained in article 15, section 4, which empowered the General Assembly to adopt implementing legislation invoking the constitutional provisions contained in article 3. Article 15, section 4, they contend, is to be construed as conferring upon the General Assembly the power to create the commission, an ethics code, and the commission's enforcement powers. Further, opponents note

that in ratifying the State Constitution, the 1986 electorate voted to reaffirm the General Assembly's plenary legislative power, as provided in article 6, section 10, to enact legislation unless prohibited by other provisions contained in that constitution. The language voted on by the electorate and as set forth in article 3, section 8, opponents contend, neither explicitly nor implicitly divests the General Assembly of its legislative power.

In examining the specific language set forth in article 3, section 8, opponents are quick to point out that the first sentence therein, which provides that "[t]he general assembly shall establish an independent non-partisan ethics commission which shall *adopt* a code of ethics," is particularly troublesome. (Emphasis added.) They note that the dictionary definition of "adopt" does not literally mean "enact." Indeed, Black's Law Dictionary defines "adopt" as meaning: "To accept, appropriate, choose, or select. To make that one's own (property or act) which was not so originally. To accept, consent to, and put into effective operation; as in the case of a constitution, constitutional amendment, ordinance, court rule, or by-law." Black's Law Dictionary, 49 (6th ed.1990). Because "adopt" is an inherently vague and ambiguous term, opponents contend, it is wholly inappropriate to infer from its usage that in approving the constitutional "ethics amendment," the electorate understood "adopt" to mean that the commission would divest the General Assembly of its legislative powers. Without doubt, it is asserted, in approving the ethics amendment, the electorate could not have possibly intended to create a "super legislature" that would in effect act as a fourth branch of government.

benefit or remuneration, until the expiration of one (1) year after termination of his or her membership in or on such body, unless the Ethics Commission shall give its approval for such appointment or election, and, further provided, that such approval shall not be granted unless the Ethics Commission is satisfied that denial of such employment or position would create a substantial hardship for the body, board, or municipality."

No. 36–14–5007 provides: "No member of the General Assembly shall seek or accept state employment as an employee or consultant, not held at the time of the member's election, while serving in the General Assembly and for a period of one (1) year after leaving legislative office."

Commission opponents further assert that the same is true with respect to the language contained in the information presented to the electorate prior to their casting their votes on each of the proposed constitutional amendments. As previously indicated, page 10 of the voters' guide pertaining to ethics provides: "The General Assembly would be directed to establish a non-partisan ethics commission that would *enforce* a code of ethics for all public officials, state and local, elected and appointed. The commission would have power to investigate charges, impose penalties and to remove officials who are not subject to impeachment." (Emphasis added.) Opponents refer to the absence of clarity and of any express language contained therein that would confer legislative powers on the commission. Rather they claim that the powers the electorate voted on and intended the commission to possess were limited to the enforcement of a code of ethics, the investigation of charges, the imposition of penalties, and the removal of officials not subject to impeachment.

Moreover, opponents aver that a review of the minutes of the meetings of the ethics committee appointed by the constitutional convention to investigate ethics reform indicates that its members never intended to divest the General Assembly of its legislative power. Nor does the language used by the committee chairman in his presentation of the committee's proposals to the entire convention's body suggest that the convention's delegates understood that the ethics amendment would divest the General Assembly of its law-making power.

Last, opponents contend that the fact that the commission initially adopted and enforced the statutory code of ethics enacted by the General Assembly as set forth in § 36-14-1, and waited several years thereafter to adopt its own code of ethics, creates an implicit presumption that the commission itself recognized that article 3, section 8, did not confer legislative power upon it.

Conversely, the commission and proponents of its powers aver that article 3, section 8, does in fact divest the General Assembly of some of its legislative power, specifically those dealing with ethics. In support of this conclusion, proponents assert that absent a contrary intent, when one reads article 3, section 8, and gives the words their plain and ordinary meaning, it is undeniably clear that the commission, rather than the General Assembly, was to be given the power to enact substantive laws regarding ethics.

Proponents assert that the phrase "which shall adopt" as it is used in the first sentence of article 3, section 8, refers to the commission, not to the General Assembly. They suggest that had the framers intended to confer upon the General Assembly the legislative power over ethics, they could have simply substituted "and" for "which." Further, unlike commission opponents, proponents claim that although the dictionary meaning given to "adopt" does not literally translate to "enact," an examination of this state's prior statutory usage of "adopt" makes it abundantly clear that it is generally understood to mean to "create," "develop," "establish," or "enact."

Proponents also suggest that the use of the phrase "as provided by law" in the last sentence of article 3, section 8, refers to the power of the General Assembly, not the commission, to enact penalties for legislative rules. They claim that all other provisions contained in article 3, section 8, should be construed as powers conferred upon the commission, otherwise the phrase "as provided by law" would be rendered meaningless.

With respect to the information presented to the electorate in the voters' guide and the language set forth on the ballot question itself, proponents assert that such language indicates a clear intent on the part of the framers to divest the General Assembly of the legislative power regarding ethics. In particular, proponents refer to the word "adopt" in the phrase "adopt a code of ethics" as it is presented in ballot question 6 regarding the ethics amendment, which accordingly is to be construed to mean "enact" or "develop."

Last, unlike commission opponents, proponents find support for the commission's law-making powers in the discussions held by the convention's ethics committee and the committee chairman's presentation to the entire convention body. The language used by the delegates in their deliberations, proponents claim, makes it readily apparent that the delegates intended to divest the General Assembly of its legislative power to enact substantive ethics laws. Furthermore, proponents suggest that the "mischief" that had occurred during the period preceding the convention provided the delegates with the motivation to get the fox out of the hen house. Indeed, they assert that in order for a code of ethics to have teeth, an independent commission must have the power to establish that code separately and apart from those afraid of being bitten.

Article 1, section 1, of the Rhode Island Constitution establishes the right of the people to alter their constitution. It further states that " 'the constitution which at any time exists, till changed by an explicit and authentic act of the whole people, is sacredly obligatory upon all.' " The method by which the people alter the constitution begins with the constitutional convention. "The convention and the delegates who compose it are the products of the formally expressed will of the people manifested through their duly qualified electors. The delegates are their agents and as such derive their power and authority solely from the people." *Opinion to the House of Representatives*, 99 R.I. 382, 384, 208 A.2d 116, 117 (1965).[8] Such was the case in 1986 when the people's delegates, in response to public demand for governmental reform, proposed the ethics amendment as one of fourteen constitutional amendments. As previously noted, the electorate voted overwhelmingly to approve the ethics amendment, which was thereafter made

part of the Rhode Island Constitution as article 3, sections 7 and 8. The task presently before this court is to determine precisely the effect of that particular constitutional amendment.

■ In construing constitutional amendments, our chief purpose is to give effect to the intent of the framers. *State ex. rel. Webb v. Cianci*, 591 A.2d 1193, 1201 (R.I.1991); *Bailey v. Baronian*, 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978) (citing *In re House of Representatives*, 45 R.I. 289, 120 A. 868 (1923)). In doing so, we rely on the well-established rule of constitutional construction that when words in a constitution are free from ambiguity, they are to be given their plain, ordinary, and usually accepted meaning. *Mikaelian v. Drug Abuse Unit*, 501 A.2d 721, 723 (R.I.1985); *Bailey*, 120 R.I. at 391, 394 A.2d at 1339; *Davis v. Hawksley*, 119 R.I. 453, 455, 379 A.2d 922, 923 (1977). Moreover, "every clause must be given its due force, meaning and effect and that no word or section must be assumed to have been unnecessarily used or needlessly added." *Kennedy v. Cumberland Engineering Co.*, 471 A.2d 195, 198 (R.I.1984) (citing *Wright v. United States*, 302 U.S. 583, 588, 58 S.Ct. 395, 397, 82 L.Ed. 439, 442 (1938)). "[W]e must presume the language was carefully weighed and that its terms imply a definite meaning." *Bailey*, 120 R.I. at 391, 394 A.2d at 1339 (citing *Opinion to the Governor*, 62 R.I. 316, 6 A.2d 147 (1939); *Blais v. Franklin*, 31 R.I. 95, 77 A. 172 (1910)).

■ In addition to the foregoing principles of construction, when one is construing constitutional provisions, it is indeed proper to "consult what extrinsic sources are available: not only the proceedings of the Constitutional Convention itself but also legislation relating to the constitution-

**8.** This principle was expressed in *Opinion to the Governor* (In re Constitutional Convention), 55 R.I. 56, 97, 178 A. 433, 452 (1935) as follows: "A constitutional convention is an assembly of the people themselves acting through their duly elected delegates. The delegates in such an assembly must therefore come from the people who choose them for this high purpose and this purpose alone. They cannot be imposed upon the convention by any other authority. Neither the legislature nor any other department of the government has the power to select delegates to such a convention. The delegates elected by and from the people, and only such delegates, may and of right have either a voice or a vote therein."

al provision in question adopted at the same time as the constitutional amendment or subsequently." *Cianci*, 591 A.2d at 1201 (citing *In re Opinion to the Governor*, 35 R.I. 166, 85 A. 1056 (1913)); *see also Gorham v. Robinson*, 57 R.I. 1, 186 A. 832 (1936), and *Opinion to the House of Representatives*, 80 R.I. 288, 294–95, 96 A.2d 627, 630 (1953). Furthermore, it is permissible to examine election-brochure arguments in construing a constitutional amendment adopted by popular vote. *See Chico Feminist Women's Health Center v. Butte Glenn Medical Society*, 557 F.Supp. 1190, 1201 n. 22 (E.D.Calif.1983). Last, "the United States Supreme Court said in *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 723, 9 L.Ed. 1233 (1838) that '[i]n the construction of the constitution, we must look to the history of the times, and examine the state of things existing when it was framed and adopted * * *.'" *In re Advisory Opinion* (Chief Justice), 507 A.2d 1316, 1320 (R.I.1986); *Bailey*, 120 R.I at 391, 394 A.2d at 1339.

## A. WHETHER THE LANGUAGE CONTAINED IN ARTICLE 3, SECTION 8, SHOULD BE INTERPRETED AS CONFERRING SUBSTANTIVE LEGISLATIVE POWER REGARDING ETHICS ON THE COMMISSION?

■ As a threshold matter, we adhere to the proposition set forth by the commission's proponents and hereby construe the phrase "which shall adopt" as it is set forth in the first sentence of article 3, section 8, of the Rhode Island Constitution as requiring that the commission, not the General Assembly, adopt a code of ethics. Indeed, if the framers had intended that the General Assembly be charged with the task of adopting a code of ethics, they could have easily substituted "and" for "which." With the foregoing construction in mind, we turn to the fundamental question of whether the term "adopt" as it is used in article 3, section 8, is to be construed as divesting the General Assembly of the legislative power to enact substantive ethics laws and rather confers such power upon the commission.

■ We are cognizant that definitionally "adopt" does not literally mean "enact,"

"develop," or "create." However, we do not find the term to be the great source of ambiguity and confusion that the parties have envisioned. On the contrary, in adhering to the foregoing principles of constitutional construction, we are of the opinion that in applying a plain and ordinary meaning to the term, it is clear that "adopt" as it is used in article 3, section 8, was intended to bestow the power to enact substantive ethics laws upon the commission.

In support we need only look to this state's historical treatment and understanding of the term. Most notably, the term "adopt" is included in the constitution itself. As previously indicated, article 15, section 4, directed that "on or before June 1, 1988, the general assembly shall *adopt* implementing legislation for Article III, Sections 7 and 8, and for Article IV, Section 10." (Emphasis added.) The General Assembly, pursuant to this constitutional directive, terminated the pre-existing Conflicts of Interest Commission and established the Ethics Commission. Thereafter, the General Assembly enacted the code of ethics as contained in chapter 14 of title 36, which the commission subsequently adopted. Obviously, by taking the foregoing actions pursuant to this constitutional mandate, the General Assembly itself understood and construed the term "adopt" as requiring it to "develop," "establish," or "enact" legislation to create an ethics commission and, albeit erroneously, a code of ethics.

Furthermore, this court has consistently understood "adopt" to mean "create," "develop," and "enact." As previously noted in expounding on the methodology to be employed regarding constitutional construction, we have held that it is indeed proper to "consult what extrinsic sources are available: not only the proceedings of the Constitutional Convention itself but also legislation relating to the constitutional provision in question *adopted* at the same time as the constitutional amendment or subsequently." (Emphasis added.) *Cianci*, 591 A.2d at 1201 (citing *In re Opinion to the Governor*, 35 R.I. 166, 85 A. 1056 (1913)); *see also Gorham v. Robin-*

*son*, 57 R.I. 1, 186 A. 832 (1936). Moreover, we have adhered to the Supreme Court rules governing constitutional construction, which themselves apply the term "adopted." Specifically, in *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 723, 9 L.Ed. 1233 (1838), the Court stated that " '[i]n the construction of the constitution, we must look to the history of the times, and examine the state of things existing when it was framed and *adopted* * * *.' " (Emphasis added.) *In re Advisory Opinion* (Chief Justice), 507 A.2d at 1320; *Bailey*, 120 R.I. at 391–92, 394 A.2d at 1339. *See also Parcell v. State*, 228 Kan. 794, 796, 620 P.2d 834, 836 (1980) (in upholding the validity of government ethics commission, the court noted that the commission is "empowered to *adopt* rules and regulations for the administration of the Campaign Finance Act"). (Emphasis added.)

Last, the term "adopt" has been used extensively in this jurisdiction throughout the provisions of the General Laws and perhaps most frequently within the APA. In it the General Assembly provided specific procedures to which each "agency" must adhere in "adopting" rules and regulations.[9] Specifically, § 42–35–2(a) provides in pertinent part that "each agency shall * * * (2) *Adopt* rules of practice * * * (3) Make available to public inspection all rules * * * *adopted* * * * by the agency." (Emphasis added.) Section 42–35–3(c) states, "No rule hereafter *adopted* is valid unless *adopted* in substantial compliance with this section." (Emphasis added.) Section 42–35–4(a) provides, "Upon *adoption* of a rule each agency shall file forthwith in the office of the secretary of state a certified copy of each such rule." (Emphasis added.) In construing the foregoing provisions of the APA, this jurisdiction has consistently recognized that "adopt" is synonymous with "enact."[10] Furthermore, it is interesting to note that the General Assembly has frequently interchanged alternative terms for "adopt" in conferring legislative power upon administrative agencies.[11]

## B. WHETHER THE FRAMERS OF THE CONSTITUTIONAL AMENDMENT INTENDED TO CONFER SUBSTANTIVE LEGISLATIVE POWER REGARDING ETHICS ON THE COMMISSION?

■ A review of the proceedings of the constitutional convention provides valuable

---

**9.** Section 42–35–1(a) defines "agency" as it is used throughout the APA as including "each state board, *commission*, department, or officer other than the legislature or the courts, authorized by law to make rules." (Emphasis added.)

**10.** Examples of further references to the term include:
General Laws 1956 (1982 Reenactment) § 31–2–4, as amended by P.L.1987, ch. 398, § 1 authorizing the assistant director of motor vehicles (DMV) "to *adopt* and enforce such rules and regulations as may be necessary" to implement the provisions governing the operation of motor vehicles on the state's roadways. (Emphasis added.)
Section 31–10–30, as amended by P.L.1984, ch. 439, § 2 pertaining to the renewal of licenses to operate motor vehicles and authorizing the DMV "to *adopt* any regulations necessary to carry out the purposes of this section." (Emphasis added.)
General Laws 1956 (1991 Reenactment) § 46–23–6(B)(1) empowering the Coastal Resources Management Council with the authority "to *adopt* regulations necessary to implement its various management programs." (Emphasis added.)

**11.** Section 42–35–5(b), as amended by P.L.1989, ch. 238, § 1 states: "The secretary of state * * * shall publish the full text of all rules *promul-*

*gated* by agencies pursuant to this chapter"; *see also* § 42–35–5.1(a)(1) and (2) (agency shall file a listing of all *promulgated* rules and a description of all rules expected to be promulgated); and § 42–35–6 ("[a]ny interested person may petition an agency requesting the *promulgation*, amendment or repeal of any rule"). Section 31–10–4 empowers the DMV to "*impose* such rules and regulations * * * as it may deem necessary for the safety and welfare of the traveling public." Section 42–17.1–2(s) gives the director of environmental management the power to "*issue* and enforce such rules * * * necessary to carry out the duties assigned * * * by any provision of law." Section 42–14.1–2(a) empowers the Department of Business Regulation (DBR) to "*promulgate* rules and regulations" regulating malpractice insurance for licensed professionals; § 42–14.2–2 empowers the DBR to "*establish* rules and regulations" to regulate automobile wrecking and salvage yards; § 42–61–2 empowers the state lottery commission to *promulgate* rules and regulations regarding the state lottery; and § 42–64–7(p) empowers the Rhode Island Port Authority and Economic Development Corporation to "*prescribe* rules and regulations" with respect to port projects. (Emphases added.)

insight into the intent of the framers when they drafted and approved Resolution No. 86–00060 (Sub A) regarding ethics in government. As previously indicated, the ethics committee appointed by the constitutional convention deliberated throughout the spring of 1986.[12] The committee members attempted to effectuate a series of proposals aimed at ethics reform into a precise resolution to be presented to the full convention on June 26, 1986. The following is taken from the transcript of the committee meeting conducted on May 22, 1986:

"Delegate Gelch: [T]he tragedy of what we have to do here is that we have to leave the implementation of a code of ethics to the thoughts [*sic*] [fox] guarding the chicken coop because once again, it's the old statement we all love our legislature, but we don't—when we look at the whole legislature, we don't trust the legislature.

"Delegate Philips: I think we should require all of those to follow a detailed code of ethics which we would *require the conflict of interest commission or successor agency to draft, promulgate, and implement.*" (Emphasis added.)

In addition, delegate Lacouture noted that the responsibility of developing a code of ethics should be placed upon the Conflict of Interest Commission or alternatively that a new ethics commission should be created to replace the Conflict of Interest Commission. The transcript further provided:

"Chairman DeSisto: Personally, I think, and let's face it—*we all distrust the General Assembly.*

"Delegate Lacouture: Maybe some of our concerns can be resolved if instead of relying on the structure to come up with the code of ethics or the prohibition—*let this commission do that.*

"Delegate Milette: You know, that's a new idea, and I like it * * *. [W]e would direct that a code of ethics be developed. * * * *[T]he code of ethics will be devel-*

*oped, and put the responsibility on the Conflict of Interest Commission instead of on the state legislature. Now that takes the fox away from the chickens * * *.* What I would like to see is to make sure it just doesn't die at the table, that it gets passed on to a responsible body which we would spell out to make the code of ethics become a reality. *Now if we are all concerned about the state legislature doing it or doing it right, let's take it away from them. Let's give it to another body.*" (Emphases added.)

In addition to the foregoing, the committee's report to the convention dated May 27, 1986, lends further insight into the framers' intent. The report states in pertinent part:

"The Committee * * * determined that it was preferable to establish the general standard in the Constitution and leave the details to the ethics commission * * *. Section 2 of the resolution directs the general assembly to establish an independent non-partisan ethics commission *which is responsible for developing a code of ethics,* investigating violations and enforcing it." (Emphasis added.)

Also noteworthy are the committee chairman's comments made in his presentation of the committee's resolution to the full convention body. He stated, "[W]e came up with an independent, non-partisan commission to enforce a Code of Ethics; *first to develop it;* and second, to enforce it, and we feel there's enough teeth in there to get the job done." (Emphasis added.)

Given the foregoing language, it is abundantly clear that the framers expressly intended to limit the General Assembly's power to enact substantive legislation regarding ethics. Rather, their primary intent was to empower the commission with the authority to develop a code of ethics, to investigate violations, and to enforce its provisions, always subject to review by the

---

**12.** The ethics committee's delegate members were as follows: chairman Anthony DeSisto, secretary Kenneth Philips, Edmund Berardinelli, Joseph Brown, Richard Dupre, John Garrett, Melvin Gelch, Eugene Gerard, Allene Maynard, Kevin McKenna, Roger Milette, Michael Napolitano, and legal counsel Peter Lacouture.

judicial branch of government consistent with the Constitution.

## C. WHETHER THE MISCHIEF THAT HAD OCCURRED PRIOR TO THE APPROVAL OF THE ETHICS AMENDMENT CAN BE CONSTRUED AS PROVIDING A MOTIVE FOR THE FRAMERS AND THE ELECTORATE TO CONFER SUBSTANTIVE LEGISLATIVE POWER REGARDING ETHICS ON THE COMMISSION?

Substantially related to the framers' intentions, as expressed through the convention's deliberations, is an analysis of the history of the times and the state of things as they existed when the ethics amendment was framed and adopted. Our goal in conducting such an examination is to focus on factors that may have provided the motivation for the framers and the electorate to confer the power to legislate substantive ethics laws upon the commission. In doing so we need not look far.

The years preceding the 1986 constitutional convention were marked by scandal and corruption at all levels of government. Indeed, widespread breaches of trust, cronyism, impropriety, and other violations of ethical standards decimated the public's trust in government. Many articles appeared in both national and international news periodicals documenting the governmental crisis that the state faced. Despite the efforts of two pre-existing ethics commissions, the Conflict of Interest Commission and the Governor's Ethics Commission, the public perception was that government lacked the ability to control ethical conduct among its own members.

Given the history of the times and the state of things as they existed when the framers adopted, and the electorate approved of, the ethics amendment, it would not be inappropriate to conclude that such factors provided an adequate motive for the framers to confer the limited power to enact substantive ethics laws primarily upon the commission. In making such a determination, one cannot ignore, and need only return to, the deliberations of the convention delegates. Without doubt, in addition to providing valuable insight into the intent of the framers in responding to public outcry for ethical reform, the committee's discussions are equally telling of the circumstances that precipitated the need and demand for reform.

As noted, in addressing ethics reform, many committee members expressed a distrust of the General Assembly and the need to "get the fox out of the hen house." In construing such comments, we adhere to the proposition set forth by commission proponents who suggest that such comments indicate a significant concern that if the task of adopting a code of ethics was left to the General Assembly, "the sharp teeth in any code of ethics could be removed by those who feared being bitten." Further, the presentational comments by the committee chairman before the entire convention body indicate an express awareness by committee members of the rampant corruption and unethical conduct that had been plaguing the state in preceding years.[13]

If the foregoing demonstrates anything at all, it is that the public did not trust government and its leaders. Its lack of trust was clearly expressed through the public's representative delegates both during the ethics-committee deliberations and before the entire convention body. Such comments made it undeniably clear that the basic motivating factor in enacting the eth-

---

13. The committee chairman stated:

"I'd like to just say one thing about my committee first. It was a cosmopolitan committee, and when we deliberated this proposal, they brought in several articles from newspapers from around the country; one from the *Miami Herald,* another one from the *London Times,* another from the *New York Times,* and guess what it was all about? It was about the state of Rhode Island and its corruption * * * I am going to make a quick quote from Archibald Cox who had an article in our own *Providence Journal* * * *. His quote is 'Widespread breaches of trust, cronyism, and other violations of ethical standards * * *. I fear, the future of our democratic system of government is at stake * * *. Self government, after all rests on the people's trust and confidence in those who do govern * * *.' This is in Rhode Island. We know what we are facing in this state. I say now is the time to act."

ics amendment was to restore the public's trust in government, which, as demonstrated, the framers and the electorate believed could only be accomplished by bestowing the power to legislate substantive ethics laws upon an independent nonpartisan ethics commission subject only to judicial review.

D. WHETHER THE INFORMATIONAL LANGUAGE PRESENTED TO THE ELECTORATE PRIOR TO AND AS CONTAINED IN THE BALLOT QUESTION REGARDING THE ETHICS AMENDMENT INDICATES THAT THE ELECTORATE UNDERSTOOD AND THEREBY INTENDED TO CONFER SUBSTANTIVE. LEGISLATIVE POWER REGARDING ETHICS ON THE COMMISSION?

█ Prior to the electorate's approval of the ethics amendment, each voter household received a voters' guide detailing each of the fourteen resolutions to be voted upon, including question 6 pertaining to ethics in government. Question 6 provided in pertinent part:

"ETHICS IN GOVERNMENT * * * Shall an ethics commission be established with authority to *adopt* a code of ethics and to discipline or remove public officials and employees found in violation of that code? Shall the general assembly *adopt* limits on campaign contributions and shall the general assembly *enact* a voluntary system of public campaign financing * * *.

"B. *Ethics Commission:* The general assembly would be directed to establish a non-partisan ethics commission that would enforce a code of ethics for all public officials, state and local, elected and appointed. The commission would have power to investigate charges, impose penalties and to remove officials who are not subject to impeachment * * *.

"C. *Campaign Finances:* The general assembly would be directed to *adopt* a voluntary system of public campaign financing * * *. The general assembly could also *establish* limits on private con-

tributions to political campaigns." (Emphases added.)

In addition, the ethics resolution as it appeared on the ballot before the electorate provided in pertinent part:

"(b) The General Assembly shall establish an independent non-partisan ethics commission which shall *adopt* a code of ethics including, but not limited to, provisions on conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure. All elected and appointed officials and employees of state and local government, of boards, commissions and agencies shall be subject to the code of ethics."

As previously discussed, it would appear that, as is frequently done and understood, the term "adopt" was being used interchangeably with "enact" and "establish." Nevertheless, it is unmistakable that the language presented to the electorate was intended by the framers to impress upon the electorate an awareness that in approving the ethics amendment, the voters would thereby confer upon the commission the legislative power to enact substantive ethics laws. We have no reason to doubt that the electorate understood that the ethics amendment would effectuate a contrary result.

E. WHETHER THERE WAS ANY LEGISLATION PERTAINING TO ETHICS ENACTED AT THE SAME TIME THE ETHICS AMENDMENT WAS APPROVED OR SUBSEQUENTLY THAT INDICATES AN INTENT TO CONFER SUBSTANTIVE LEGISLATIVE POWER REGARDING ETHICS ON THE COMMISSION?

█ Last in this court's consideration of factors bearing upon constitutional construction is an examination of any legislation regarding ethics passed at the same time the ethics amendment was approved or thereafter. The General Assembly, pursuant to the constitutional directive set forth in article 15, section 4, of the Rhode Island Constitution terminated the existence of a pre-existing Conflict of Interest Commission and duly established the fif-

teen-member Rhode Island Ethics Commission. The General Assembly further sought to establish the Rhode Island Code of Ethics in Government as provided in G.L.1956 (1990 Reenactment) chapter 14 of title 36. On December 17, 1987, the commission adopted and thereafter enforced the enacted code of ethics until it expressed the desire to formulate ethics laws on its own.

In enacting the code of ethics, the General Assembly obviously believed that it in fact retained the power to legislate over ethics. Furthermore, opponents of the commission's legislative powers would have this court believe that the commission's subsequent adoption of the code of ethics creates a presumption that the commission itself construed article 3, section 8, of the Rhode Island Constitution as conferring upon the General Assembly the power to legislate over ethics. Nevertheless, given the historical use of "adopt" and the expressly stated intent of the framers, the fact that the General Assembly gratuitously enacted a code of ethics and that the commission may have initially believed it was mandated to adopt the code should not be construed as placing any limitations upon the commission's legislative power. Any such limitations would clearly negate the express provisions set forth in article 3, section 8.

To conclude our analysis of this first question of law, we are of the opinion that the plain and ordinary meaning of the term "adopt" as set forth in article 3, section 8, clearly indicates an intent by the framers to confer upon the commission the power to enact substantive ethics laws. Without doubt, as a result of the dubious climate in which all levels of government found themselves, the framers of the ethics amendment to the constitution believed that the only means of restoring public confidence in government was to divest the General Assembly of its legislative power regarding ethics. Such an intent was clearly expounded by the framers during their deliberations and presented by them both in the informational brochure distributed to the electorate and on the 1986 ballot. We see no reason to believe that the voters gave question 6 a meaning other than that intended by the framers and contained in the precise language in which it was presented.

## II

The second question propounded to this court is "[w]hether Article III, Section 8 of the Rhode Island Constitution divests the General Assembly of some or all of its legislative power to enact ethics laws governing public officials and employees and instead vests that power in the Rhode Island Ethics Commission."

Commission opponents aver that the legislative power of the General Assembly is plenary and that such power was reaffirmed by the 1986 electorate. Accordingly they contend that given the absence of express language in article 3, section 8, conferring upon the commission the power to enact substantive ethics laws, it is inappropriate to conclude that the General Assembly has been divested of the legislative power over ethics. Conversely, the commission and its proponents contend that, although the electorate reaffirmed the General Assembly's plenary power, the language of article 3, section 8, conferring legislative power over ethics upon the commission impliedly limits the power of the General Assembly to do the same. Proponents assert that although article 3, section 8, should not be construed as extinguishing the General Assembly's legislative power over ethics entirely, it nonetheless necessarily limits the General Assembly from enacting ethics-related laws that are inconsistent with or in conflict with those enacted by the commission.

The Rhode Island Constitution reposes all legislative power in the General Assembly by virtue of article 6, section 2. As previously indicated, the 1986 electorate reaffirmed the plenary legislative power of the General Assembly, as encapsulated in article 6, section 10: " 'The general assembly shall continue to exercise the powers it has heretofore exercised, unless prohibited in this Constitution.' This provision must be construed to constitute a reaffirmation of the powers historically exercised by the Legislature under the prior constitution."

*Kass v. Retirement Board of the Employees' Retirement System of Rhode Island,* 567 A.2d 358, 361 (R.I.1989).

"Unlike the United States Congress, the Rhode Island General Assembly does not look to our State Constitution for grants of power." *Id.* (citing *In re Advisory Opinion to the House of Representatives,* 485 A.2d 550, 553 (R.I.1984); *Payne & Butler v. Providence Gas Co.,* 31 R.I. 295, 316–17, 77 A. 145, 154 (1910)). To the contrary, "[i]t is well settled that our state constitution is one of limitation on the exercise of the powers inhering in the general assembly, which we have repeatedly held possesses all the powers of the crown and parliament at the time of the adoption of the constitution other than those conferred upon the federal government." *Nugent v. City of East Providence,* 103 R.I. 518, 525, 238 A.2d 758, 762 (1968); *see also Gelch v. State Board of Elections,* 482 A.2d 1204, 1208 (R.I.1984); *Opinion to the Governor,* 95 R.I. 109, 114–15, 185 A.2d 111, 114 (1962). This court has consistently adhered to the view that article 6, section 10, "confers upon the General Assembly legislative power that is broad and plenary, 'save insofar as it may be prohibited in express terms by the constitution of this state or limited by the federal constitution.'" *Kass,* 567 A.2d at 361 (quoting *Forte Brothers, Inc. v. Department of Transportation,* 541 A.2d 1194, 1195 (R.I.1988)); *see also Gelch,* 482 A.2d at 1208 (limitations on legislative power must be "'created and imposed by express words or arise by necessary implication'"), and *Miller v. Clarke,* 47 R.I. 13, 17, 129 A. 606, 608 (1925). Therefore, in the absence of any constitutional limitation, the General Assembly has the legislative power to enact substantive ethics laws.

In addition to reaffirming the plenary legislative power of the General Assembly, the 1986 electorate overwhelmingly approved the ethics amendment that was thereafter made part of the constitution in article 3, sections 7 and 8. We have ruled that the terms of article 3, section 8, expressly confer upon the commission the limited and concurrent power to enact substantive ethics laws. Accordingly, it logically follows that such an affirmative grant of power to the commission necessarily implies a limitation of the same on the part of the General Assembly or any other body. This is not to say, however, that the General Assembly is prohibited from enacting ethics laws altogether; rather, the General Assembly is merely limited to enacting laws that are not inconsistent with, or contradictory to, the code of ethics adopted by the commission.

## III

The last question that we must address is whether article 3, section 8, will be valid under the United States Constitution and consistent with the Rhode Island Constitution if it is interpreted as conferring upon the Rhode Island Ethics Commission the power to enact substantive ethics laws independent of and/or to the exclusion of the Legislature.

Commission opponents aver that any conclusion other than one finding that article 3, section 8, does not divest the General Assembly of any of its legislative powers over ethics would violate the Federal Constitution and be inconsistent with the provisions of the Rhode Island Constitution. Opponents contend that if the commission were to be empowered with legislative rule-making authority, the practical effect would be to create a fourth branch of government, a so-called super legislature, that would perform its functions without any of the usual checks and balances associated with our republican form of government and would therefore constitute a violation of the Guaranty Clause of Article 4, section 4, of the United States Constitution. Specifically, opponents point to the fact that commission members are not elected officials, rather they are appointed by the Governor and, as a result, are not representative of, or accountable to, the people of the State of Rhode Island.

Opponents further contend that allowing the commission to enact its own ethics laws would be violative of the doctrine of separation of powers. Specifically, opponents point to article 6, section 2, of the Rhode

Island Constitution which provides, "The legislative power * * * shall be vested in two houses, the * * * senate, the other the house of representatives * * *. The concurrence of the two houses shall be necessary to the enactment of laws." Further, article 9, section 14, provides in pertinent part: "Every bill, resolution, or vote * * * which shall have passed both houses of the general assembly shall be presented to the governor. If the governor approve [*sic*] it * * * it shall become operative." Allowing the commission to enact ethics laws while bypassing the concurrence of the House and the Senate and the Governor's veto authority would thereby inhibit the General Assembly and the Governor in the performance of their constitutional duties. In addition, given that article 3, section 8, empowers the commission with the authority to investigate and enforce ethics violations, any conferring of legislative power upon the commission would result in an excessive commingling of constitutional powers. Interpreting article 3, section 8, in such a fashion, opponents contend, would impermissibly empower the commission with the authority to act as legislator, prosecutor, and judge.

Conversely, proponents contend that interpreting article 3, section 8, as conferring legislative power upon the commission is not violative of either the Guaranty Clause or the doctrine of separation of powers. Proponents contend that the fact that commission members are appointed instead of elected officials does not destroy our representative form of government. Rather they assert that the commission and its members are subject to many of the usual checks and balances that characterize a representative government. Specifically they point to the fact that commission members are appointed by the Governor, two-thirds from lists submitted by the General Assembly. The commission members serve fixed terms that may be altered by the General Assembly. Any rules, regulations, or decisions rendered by the commission are subject to judicial review under both article 10, section 2, of the Rhode Island Constitution and the provisions of the APA. Furthermore, any bite from the commission's enforcement of violations of ethics laws is limited by the General Assembly's power to enact penalties for such violations. Last, proponents assert that article 3, section 8, does not confer unbridled legislative power upon the commission but rather limits its law-making powers to that of ethics.

Nor does the blending of legislative, executive, and judicial powers violate the doctrine of separation of powers. Instead, proponents assert that inherent in the right of the people to alter their constitution is the right to alter their form of government and to distribute powers as they see fit. Proponents aver that some overlapping of powers is permissible and that absent a delegation of a department's entire power to another, the separation-of-powers doctrine remains intact.

■ Article 5 of the Rhode Island Constitution provides for a tripartite form of government, stating: "The powers of the government shall be distributed into three departments: the legislative, executive and judicial." As stated previously, article 1, section 1, authorizes the people to alter and amend their constitution. The right to do so is checked only by the limits imposed by the Federal Constitution. *See Omaha National Bank v. Spire*, 223 Neb. 209, 217, 389 N.W.2d 269, 275 (1986); *Dickinson v. Fund for the Support of Free Public Schools*, 187 N.J.Super. 224, 250, 454 A.2d 491, 505 (1982). "Even to the shock and dismay of constitutional theoreticians, the people may add provisions dealing with 'non-fundamental' rights, as well as provisions bearing the most tenuous of relationships to the notion of what constitutes the basic framework of government." *Spire*, 223 Neb. at 217, 389 N.W.2d at 275. In altering their constitution, the question of "[h]ow power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself." *Highland Farms Dairy, Inc. v. Agnew*, 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 461 n. 6, 101 S.Ct. 715, 722 n. 6, 66 L.Ed.2d 659, 667 n. 6 (1981) ("[t]he States

are free to allocate the lawmaking function to whatever branch of state government they may choose"); *Mayor of the City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 615 n. 13, 94 S.Ct. 1323, 1330 n. 13, 39 L.Ed.2d 630, 641 n. 13 (1979) ("[t]he Constitution does not impose on the states any particular plan for the distribution of government powers").

In accordance with the foregoing authority the 1986 electorate seemingly sought to alter the plenary legislative power of the General Assembly with the affirmation of the ethics amendment. When the validity of the amendment is passed upon, " '[e]very reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to the Constitution when it is attacked after its ratification by the people' * * * and its unconstitutionality should not be declared except upon 'inescapable grounds.' " *Opinion of the Justices,* 101 N.H. 541, 543, 133 A.2d 790, 792 (1957) (citing *Chronicle & Gazette Pub. Co. v. Attorney General,* 94 N.H. 148, 48 A.2d 478, 168 A.L.R. 879 (1946)).

The Guaranty Clause as it is contained in article 4, section 4, of the United States Constitution provides, "The United States shall guarantee to every state in this Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened) against domestic violence." The concept of what is exactly meant by a representative form of government has been the subject of great debate.

In *Opinion to the Governor,* 95 R.I. at 114, 185 A.2d at 114, this court noted that "[U]nder the provisions of sec. 4 of art. IV of the federal constitution the United States is required to guarantee a republican form of government to every state. In *Minor v. Happersett,* 88 U.S. 162, at page 175 [22 L.Ed. 627], the [C]ourt pointed out that the guaranty clause does not designate the exact form of government that is so guaranteed but said: 'The guaranty necessarily implies a duty on the part of the States themselves to provide such a government.' A repub-

lican form of government contemplates representative government and, the states being obligated to provide such government, obviously they have the power to establish and maintain such government."

Furthermore, in examining what is contemplated by a representative form, we have concluded that

"[R]epresentation within the purview of our constitution relates to that classic concept of representative government that inheres in the republican form of government that is secured to the several states by the guarantee clause of the federal constitution, art. IV, sec. 4. Of this form of government the Supreme Court of the United States said: ' * * * the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves.' " *Opinion to the Governor,* 95 R.I. 88, 98, 183 A.2d 806, 811 (1962) (quoting *In re Duncan,* 139 U.S. 449, 461 [11 S.Ct. 573, 577, 35 L.Ed. 219]); *see also Van Sickle v. Shanahan,* 212 Kan. 426, 450, 511 P.2d 223 (1973) ("[a] republican form of government is a government administered by representatives chosen or appointed by the people or by their authority").

James Madison's notes on the Federal Constitution are the primary source of the historical interpretation of the Guaranty Clause. Madison indicates that " '[w]hen the founding fathers wrote the Constitution of the United States they enthusiastically established a republican form of government which became the cornerstone of American written constitutions.' " *Van Sickle v. Shanahan,* 212 Kan. at 440, 511 P.2d at 235–36 (citing James Madison's report "Debates in the Federal Convention of 1787").

" 'A distinguishing feature of this form of government is that the people are capable of self-government and have the right to choose their own officials*

*for governmental affairs and enact their own laws pursuant to the legislative power reposed in representative bodies. This representative system is the essence of the republican form of government and is premised upon the fact that the people cannot speak in mass, and the right to choose a representative is every citizen's portion of sovereign power.'"* 212 Kan. at 441, 511 P.2d at 236.

*" 'If we resort, for a criterion, to the different principles on which different forms of government are established, we may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior. It is essential to such a government, that it be derived from the great body of the society, not from an inconsiderable proportion, or a favoured class of it; otherwise a handful of tyrannical nobles, exercising their oppressions by a delegation of their powers, might aspire to the rank of republicans, and claim for their government the honorable title of republic. It is sufficient for such a government, that the persons administering it be appointed, either directly or indirectly, by the people; and that they hold their appointments by either of the tenures just specified; otherwise every government in the United States, as well as every other popular government that has been or can be well organized or well executed, would be degraded from the republican character.'"* (Emphasis added.) *Id.* at 443–44, 511 P.2d at 238.

Madison further outlined this explanation of the Guaranty Clause, stating:

*" 'In a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchial innovations. * * * But the authority extends no farther than to a guaranty of a republican form of government, which supposes a preexisting government of the form which is to be guaranteed. As long, therefore, as the existing republican forms are contained by the states, they are guaranteed by the federal constitution. Whenever the states may choose to substitute other republican forms, they have a right to do so, and to claim the federal guaranty for the latter. The only restriction imposed on them is, that they shall not exchange republican for anti-republican constitutions.'"* *Id.* at 444, 511 P.2d at 238.

With the constitutional framework before us, it is clear that article 3, section 8, as we have interpreted it, does not violate the federal Guaranty Clause. The fact that commission members are appointed rather than elected does not destroy our representative form of government. As Madison indicated, republican forms are preserved by either the "direct or [the] indirect appointment" of government officials "for a limited period" who are derived "from the great body of society." Commission members are appointed by the Governor, two-thirds of whom are taken from lists submitted by the General Assembly. Commission members serve for a limited five-year appointment, and the creation of the commission was affirmed by a majority of the state's electorate. This jurisdiction has consistently recognized the authority of the General Assembly to create administrative agencies and the authority of the Governor to appoint agency officials. The commission investigates members of both the legislative branch and the executive branch. The sharing of appointment responsibilities over a majority of members ensures fair consideration and independence should the commission be called upon to investigate officials responsible for their appointment.[14]

---

14. A somewhat similar parallel to the issue before us is found in *Parcell v. State,* 228 Kan. 794, 620 P.2d 834 (1980), in which the Supreme Court of Kansas was confronted by the question of whether a governmental ethics commission, the majority of which is appointed by legislators, constitutes a usurpation of executive power by the legislative branch of government, thereby

Further, the commission, like any other governmental body, is subject to many of the usual checks and balances associated with our tripartite form of government. As proponents contend, any rules, regulations, and decisions rendered by the commission are subject to judicial review pursuant to this court's power to review questions of law as provided in article 10, section 2. Moreover, like other "agencies," as the term is defined by § 42–35–1 of the APA, the commission is subject to the provisions contained therein, including the judiciary's power to review the commission's rule-making functions as set forth in § 42–35–7. In addition, the General Assembly retains the power to enact laws regulating the composition of the commission and sets penalties for violations of the commission's rules and regulations. *See generally State v. Kalian*, 122 R.I. 443, 408 A.2d 610 (1979).

With respect to the doctrine of separation of powers, there is a split of authority over whether the concept of separation of powers is expressly guaranteed to the states by Article 4, section 4, of the Federal Constitution. On the one hand, it is suggested that the doctrine is an inherent and integral element of the republican form of government and as an element thereof is expressly guaranteed to the states by the Guaranty Clause. *See Van Sickle*, 212 Kan. at 447, 511 P.2d at 240–41. On the other hand, other jurisdictions adhere to the principle that although the doctrine of separation of powers is extremely important and fundamental to both federal and state governments, such a doctrine is not guaranteed to the states through the federal constitutional concept of the republican form of state government. *See In re Interrogatories Propounded By the Senate*, 189 Colo. 1, 13, 536 P.2d 308, 318 (1975).

We adhere to the former view with respect to separation of powers and have recognized that

"[T]he twin purposes of preventing concentrations of power dangerous to liberty and promoting governmental efficiency are served if we define a constitutional violation of separation of powers as *an assumption by one branch of powers that are central or essential to the operation of a coordinate branch,* provided also that the assumption disrupts the coordinate branch in the performance of its duties and is unnecessary to implement a legitimate policy of the Government." (Emphasis added.) *State v. Jacques*, 554 A.2d 193, 196 (R.I.1989) (quoting *Chadha v. Immigration and Naturalization Service*, 634 F.2d 408, 425 (9th Cir.1980)); *see In re Interrogatories Propounded By the Senate*, 189 Colo. at 12, 536 P.2d at 317.

The doctrine of separation of powers has undergone several changes in interpretation. Early on, "[t]he classical concept of the doctrine * * * considered the *functions* appropriate to each of the three branches of government vested in a separate body of public servants. Perfection of the system * * * required the dividing lines to be broadly and clearly defined." *Timpanogos Planning and Water Management Agency v. Central Utah Water Conservation District*, 690 P.2d 562, 567 (Utah 1984). However, under the modern interpretation of the doctrine, "one branch of government may exercise some of the powers of the other departments '* * * *when it is not an assumption of the whole power of another department,* and when the exercise of the other power does not jeopardize individual liberty.'" (Emphasis added.) *Id.* (quoting C. Sands, *Sutherland Statutory Construction*, § 3.06 (4th ed.1985)).

violating the doctrine of separation of powers. The court noted that the ethics commission consisted of eleven members, of which five were appointed by the Governor and the remainder appointed by the Legislature. Commission functions included the power to adopt rules and regulations governing the administration of the Campaign Finance Act and the power to investigate violations. *Id.* at 797, 620 P.2d at 836. However, the commission was not given en-

forcement power, which was left to the legislative and executive branches. *Id.* In adhering to the recognition that the doctrine of separation of powers permits to some extent the blending of powers, the court concluded that the fact that the majority of commission members were appointed by the Legislature did not usurp the executive power of appointment. *Id.* at 798, 620 P.2d at 837.

In addressing the concept of separation of powers, Madison noted in *Federalist* No. 47:

" 'The several departments of power are distributed and blended in such a manner, as at once to destroy all symmetry and beauty of form; and to expose some of the essential parts of the edifice to the danger of being crushed by the disproportionate weight of other parts.   * * *   *The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.*' " (Emphasis added.)   *Van Sickle,* 212 Kan. at 445, 511 P.2d at 238–39; *see also United States v. Brown,* 381 U.S. 437, 85 S. Ct. 1707, 14 L.Ed.2d 484 (1965).

Madison also stated:

" *'[W]here the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution are subverted.   * * *   If we look into the constitutions of the several states * * * there is not a single instance in which the several departments of power have been kept absolutely separate and distinct.'* "   212 Kan. at 446, 511 P.2d at 240.

Further, in his commentaries on the United States Constitution, Justice Story suggested that

"when we speak of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. *It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence,* the one upon the other, in the slightest degree. *The true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the departments; and that such exercise of the whole would subvert the principles of a free constitution.*" (Emphasis added.)   *In re Interrogatories Propounded by the Senate,* 189 Colo. at 13, 536 P.2d at 318 (quoting J. Story, *I Commentaries on the Constitution of the United States* 393 (5th ed. 1891)).

Given the modern interpretation of the doctrine of separation of powers permitting, indeed requiring, some degree of blending of departmental powers, we do not find a violation of the doctrine in light of our interpretation of article 3, section 8. The ethics amendment merely shifted the legislative power regarding ethics away from the General Assembly. It did not, however, divest the General Assembly of its "whole" legislative power or the power to enact ethics laws that are not in conflict with those enacted by the commission. Nor has the commission assumed powers that are *central or essential to the operation of* the General Assembly. And just as the General Assembly has not been divested of its entire legislative power, the commission's power is not limitless. Rather it is restricted to enacting rules and regulations governing ethics. Furthermore, although we have construed article 3, section 8, as endowing the commission with the authority to adopt a code of ethics, this empowerment is not to be construed as being so comprehensive as to give the commission the ability to adopt a code that infringes upon the legislative and the executive powers. For example, the commission may not set standards that seriously impinge upon the executive or the legislative branch's ability to perform the usual or ordinary duties for which each is elected, including the appointment of various officials to public office.

Nor do we find that the doctrine of separation of powers is threatened by the commission's assumption of legislative, executive, and judicial powers. Clearly the commission is empowered to exercise power traditionally ascribed to the legislative, executive, and judicial branches, but unless the commission is usurping the power of another or coercively influencing the others, there is no violation of the doctrine of separation of powers. The exercise of a

combination of these powers long has been upheld with respect to administrative agencies and has been consistently recognized as constitutional. *Milardo v. Coastal Resources Management Council*, 434 A.2d 266, 271 (R.I.1981). "As long as the Legislature that creates the agency demonstrates standards or principles to confine and guide the agency's power, this court will sustain the delegation." *Davis v. Wood*, 427 A.2d 332, 336 (R.I.1981). Strict standards and guideposts accompanied the creation of the commission such that its powers are expressly limited. The fact that the people directly, rather than indirectly through their representatives, chose to delegate such powers to the commission does not impinge upon the constitution. We note for purposes of comparison that "The generally accepted view is that the system of direct legislation which has been in common use throughout the various state governments since their inception is clearly consistent with a republican form of government, even though it may deprive the legislature of some lawmaking power or powers held by it at the adoption of the Federal Constitution. *Accordingly, it has been held that such direct powers of legislation may be exercised by the people through the initiative and referendum, either on the state or local level, it being pointed out that the representative character of the government still remains under that system and that the people have thereby simply reserved to themselves a larger share of legislative power, and that therefore they have not overthrown the republican form of government or substituted another in its place.*" *Cagle v. Qualified Electors of Winston County*, 470 So.2d 1208, 1210 (Ala.1985) (quoting 16A Am.Jur.2d *Constitutional Law* § 632 (1979)).

In contrast, instead of reserving the legislative power with respect to ethics unto itself, the 1986 electorate transferred a portion of legislative power from one representative body to another.

Also misplaced is the assertion that the doctrine is threatened by the commission's ability to enact laws while bypassing the concurrence of both houses and the Governor's veto power. To the contrary, such has been consistently the accepted practice of governmental administrative agencies.

In summary, we are of the opinion that the creation of the commission has not resulted in the establishment of a fourth branch of government. The representative character of the government still remains. The people have simply vested in the commission a limited share of legislative power to make law in the area of ethics. They have not overthrown the republican form of government of this state. The residuum of legislative power is still vested in the General Assembly pursuant to article 6, section 10. The legislative, executive, and judicial powers are not impaired. Nor are their powers or authority materially curtailed.

Furthermore, although we answer each question propounded in the affirmative, our response is not to be construed as approving the commission's orders and opinions to date. Rather we reserve the power to decide on a case-by-case basis whether the orders and decisions of the commission have had such an impact on legislative and executive officials' abilities to perform their elected functions as to become impermissibly intrusive. Parties aggrieved by acts of the commission always have the right to test their legality by way of declaratory judgment or in appropriate circumstances by requesting an advisory opinion from this court.

---

Chief Justice THOMAS F. FAY

---

Associate Justice THOMAS F. KELLEHER

---

Associate Justice JOSEPH R. WEISBERGER

---

Associate Justice FLORENCE K. MURRAY

---

Associate Justice DONALD F. SHEA